In the Matter Of:



*ERIK YODER*

*vs.*

*THE O'NEIL GROUP, LLC, et al.*

---

*WILLIAM O'NEIL*

*March 07, 2017*

---

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MARYLAND

3

4    ERIK YODER,                    *

5              Plaintiff,           *

6         vs.                       *   Civil Action

7    THE O'NEIL GROUP, LLC,         *   No. 8:16-CV-00900 DKC

8    et al.,                        *

9              Defendants.          *

10

11

12         Oral Deposition of WILLIAM T. O'NEIL

13    In His Individual Capacity and As Corporate

14      Representative of THE O'NEIL GROUP, LLC

15               Rockville, Maryland

16              Tuesday, March 7, 2017

17                  10:08 a.m.

18

19

20    Job No.: WDC-118109

21    Pages 1 - 212

22    Reported by:  Vicki L. Forman
```

```
1                    Oral Deposition of WILLIAM T. O'NEIL, held at

2    the offices of:

3

4            Law Office of Howard B. Hoffman

5            600 Jefferson Plaza, Suite 304

6            Rockville, Maryland  20852

7            (301) 251-3752

8

9

10

11                    Pursuant to agreement, before Vicki L.

12   Forman, Court Reporter and Notary Public in and for the

13   State of Maryland.

14

15

16

17

18

19

20

21

22
```

```
 1              A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4        HOWARD B. HOFFMAN, ESQUIRE

 5        Law Office of Howard B. Hoffman

 6        600 Jefferson Plaza, Suite 304

 7        Rockville, Maryland  20852

 8        (301) 251-3752

 9

10

11

12    ON BEHALF OF THE DEFENDANTS PRO SE:

13        WILLIAM T. O'NEIL, ESQUIRE

14        The O'Neil Group, LLC

15        Suite 1375

16        7500 Old Georgetown Road

17        Bethesda, Maryland  20814

18        (202) 684-7140

19

20

21

22
```

1                    C O N T E N T S

2    EXAMINATION OF WILLIAM T. O'NEIL              PAGE

3           By Mr. Hoffman                           5

4

5

6                    E X H I B I T S

7               (Retained by Counsel)

8    O'NEIL DEPOSITION EXHIBIT                     PAGE

9    Exhibit 1   Notice of Corporate Designee Depo    5

10   Exhibit 2   Notice of Deposition                 5

11   Exhibit 3   10/30/15 E-mail                      41

12   Exhibit 4   Offer of Employment to Yoder         61

13   Exhibit 5   6/30/14 Letter of Resignation        82

14   Exhibit 6   6/12/14 E-mail                       98

15   Exhibit 7   6/17/14 E-mail Chain                101

16   Exhibit 8   6/18/14 E-mail Chain                110

17   Exhibit 9   6/3014 E-mail Chain                 122

18   Exhibit 10  6/30/14-7/7/14 E-mail Chain         143

19   Exhibit 11  Defendants' Answers to Complaint    156

20   Exhibit 12  6/4/14 E-mail Chain                 184

21   Exhibit 13  5/29/14 E-mail Chain                186

22   Exhibit 14  7/9/14-8/12/14 E-mail Chain         193

```
 1   believe 2011.

 2        Q      Has she worked for BSI since that period of

 3   time?

 4        A      There was a period of time when she was

 5   partially paid by BSI and partially paid by MCM.  At the

 6   beginning there was a very close relationship between

 7   MCM and BSI.

 8        Q      And just so we're clear, MCM stands for what?

 9        A      I'm not sure.  MCM Capital Partners.

10        Q      And BSI, does it stand for anything in

11   particular?

12        A      I don't believe so, no.

13        Q      And who is MCM Capital?

14        A      There's three partners, Mike Niccolini, Lara

15   George and Steve Trowern and they raise money and invest

16   it.

17        Q      They raise money from investors?

18        A      Yes.

19        Q      Is it like a hedge fund?

20        A      No.

21        Q      How do they raise money?

22        A      I don't know specifically.  I don't know the
```

1    structure of how -- at a certain point in time they had

2    multiple investors put money into a fund and that fund

3    was used to invest in assets.

4        Q     What type of assets do they invest in?

5        A     Primarily since I've been involved

6    nonperforming loans.

7        Q     Nonperforming, would it be residential home

8    loans?

9        A     Residential mortgages, yes.

10       Q     Do they invest in any other types of assets

11   that you know of?

12       A     I don't know.

13       Q     Are you related to any of those partners?

14       A     Yes.

15       Q     How so?

16       A     Steve Trowern is my brother-in-law.

17       Q     Would that be Danielle's brother?

18       A     No.

19       Q     Can you explain the relationship?

20       A     Steve's wife is my wife's sister.

21       Q     Steve's wife is your wife's sister so there's

22   a few steps there?

```
 1    Philadelphia but I worked from D.C.  Burke Pyle became

 2    Burke O'Neil.  I worked there until 2010 then I joined

 3    the United States Department of Defense in the counsel's

 4    office.  I worked there until 2011 and then we started

 5    The O'Neil Group in 2011.

 6         Q     Burke & O'Neil, who is Burke?

 7         A     Susan Burke.

 8         Q     While you were at Burke & O'Neil did you do

 9    any employment work?

10         A     No.  No, I don't believe so.

11         Q     Does Ms. Burke do any employment work?

12         A     I don't believe so.

13         Q     And had you done any employment work for

14    Covington & Burling?

15         A     I did one pro bono case.  That was about it.

16         Q     What about Swidler & Berlin?

17         A     No, I didn't do any employment law work

18    there.

19         Q     And Rotbert, what kind of work did you do

20    there?

21         A     It was insurance coverage for policyholders.

22         Q     And is my understanding correct that that's
```

1    where you met Mr. Shanahan?

2        A    Yes, that's correct.

3        Q    And I take it you two stayed in touch after

4    you left Rotbert?

5        A    On occasion.

6        Q    But you were friendly with him?

7        A    Yes.

8        Q    Now, what kind of work did you perform for

9    the Department of Defense?

10       A    It was mostly prosecuting the revocation of

11   security clearances for private contractors.

12       Q    How did you get that job?  What drew you to

13   that?

14       A    I needed a job and I had a friend who worked

15   there and got me an interview.

16       Q    Did Burke & O'Neil just -- what's the word?

17   Close or unwind?

18       A    It continued as Burke, PLLC I believe after I

19   left.

20       Q    And you were a partner at Burke & O'Neil?

21       A    Yes.

22       Q    And did you have any associate attorneys

```
 1    employed by you?

 2         A     Yes.

 3         Q     How many?

 4         A     I'd say at the beginning there were three and

 5    we had some temporary people come in on a case by case

 6    basis so at a certain point we probably had six then

 7    went down to one or two.

 8         Q     Now, that brings us to the formation of The

 9    O'Neil Group, correct?

10         A     Correct.

11         Q     Now, prior to The O'Neil Group but before you

12    worked for the Department of Defense were you employed

13    by MCM?

14         A     No.

15         Q     So you went from the Department of Defense to

16    forming The O'Neil Group?

17         A     Correct.

18         Q     And what was the purpose of forming The

19    O'Neil Group?

20         A     To assist MCM and BSI in managing their legal

21    caseload.

22         Q     And specifically what would that involve?
```

1        A        Essentially we acted like the legal

2    department on site for the loans managed in Bethesda.

3    We retained counsel, foreclosure counsel around the

4    country.  We processed and approved their invoices,

5    submitted their invoices to BSI for payment and then

6    when BSI paid us we paid local counsel.  We oversaw the

7    litigation of more complicated cases, claims brought by

8    borrowers against BSI or MCM or whatever financial

9    vehicle was the owner of the loans which changed over

10   time.  I think that was our primary function.

11       Q        How did it come about that you obtained that

12   work?

13       A        The partners at MCM asked me to do it.

14       Q        And which partners would those be?

15       A        Mr. Trowern, Mr. Niccolini and Ms. George.

16       Q        And how did it come -- well, how does BSI fit

17   into this scheme or shall I say environment, how's that?

18                What is BSI?

19       A        BSI is a mortgage servicer and I think

20   they're headquartered in Irving, Texas and I believe,

21   although I've never seen any of the documents, they

22   entered into an arrangement with MCM where they -- MCM

1    and BSI built a branch of BSI in Bethesda to service the

2    loans being purchased by MCM.

3        Q      So BSI is a mortgage servicer that opened a

4    branch office for the purposes of assisting MCM in its

5    servicing of mortgages?

6        A      Correct.

7        Q      And the mortgages that MCM was servicing had

8    been bought in different types of markets; is that

9    correct?

10       A      Yeah, there's a -- I don't know exactly how

11   it works but there is a market for mortgages.  They

12   change hands from time to time.

13       Q      And there's a market for nonperforming

14   mortgages?

15       A      Correct.

16       Q      And these things can be bundled together, is

17   that your understanding?

18       A      Well, my understanding is that the holder of

19   mortgages would make certain what they call pools were

20   available for purchase, multiple and they would auction

21   them essentially.  People would submit bids and the high

22   bid or however they determined who purchased it, that's

1    the business MCM was in.

2        Q     So for example, if Bank of America had loaned

3    money to a thousand home borrowers and those borrowers

4    were not -- those loans were no longer performing

5    according to the terms of the mortgage, Bank of America

6    might auction a pool of those mortgages through whatever

7    markets it has and MCM would bid on those?

8        A     They didn't have to be nonperforming.  They

9    can sell performing loans.  They can sell a mix of

10   performing and nonperforming.  Bank of America decides

11   they want to sell those assets.  I'm not a banker but my

12   understanding is those loans are assets of Bank of

13   America and if they want to sell them for whatever

14   reason they make them available for purchase.

15       Q     And MCM would bid on them?

16       A     Correct.

17       Q     And if MCM's bid was accepted they would then

18   become the holder of those mortgage notes?

19       A     It wasn't MCM exactly.  They would create an

20   investment vehicle to own them.

21       Q     So MCM might create like another corporate

22   entity, a trust?

```
 1      A      Usually was a trust.

 2      Q      They would create a trust and the trust would

 3   then own the mortgage?

 4      A      That's my understanding.  I never worked on

 5   that side of it.

 6      Q      But at that point MCM needed someone to

 7   handle all of the paperwork that might be associated

 8   with such a mortgage, correct?

 9      A      I think it was explained to me that they

10   wanted a lawyer to deal with the lawyers.

11      Q      To deal with the lawyers?

12      A      Yeah.

13      Q      Now, when these three individuals came to you

14   did you have any kind of prior history or employment

15   experience in this line of work?

16      A      No.

17      Q      Did they understand that you didn't have any

18   prior experience in that?

19      A      Yes, I believe so.

20      Q      And did you take any steps to familiarize

21   yourself with their businesses and what they were

22   involved in?
```

1    A    Yes.

2    Q    And what did you do?

3    A    I spoke to them in some depth about what it

4    is they were doing and looking for.  I believe I

5    purchased some books and read case law relevant to the

6    field.

7    Q    Because your job would have been to supervise

8    the lawyers that they were hiring, correct?

9    A    Correct.

10   Q    So you would have to have had some knowledge

11   of the legal business that they were involved in?

12   A    Correct.

13   Q    And it was BSI that would then pay The O'Neil

14   Group; is that correct?

15   A    Correct.

16   Q    And I assume that MCM would pay BSI?

17   A    The trust.

18   Q    The trust?

19   A    Yes, I believe so.

20   Q    The trust would pay BSI and BSI in turn would

21   pay you.  You in turn would pay various different law

22   firms that were working in various different states?

1      A     Yes, that's correct.

2      Q     By the way, was this in almost every state or

3  was it limited to only certain states?

4      A     There was no limitation.

5      Q     Do you recall whether it was all 50 states?

6      A     I don't think they ever purchased loans in

7  Vermont.  There were certain states that for whatever

8  reason those mortgages didn't trade hands the way others

9  did.  There might have been one loan in Wyoming.  I

10  don't recall any North Dakota loans.  I don't think I

11  ever had to find a lawyer in North Dakota but generally

12  yes, every state.

13      Q     Did you have anyone working with you,

14  assisting you in this supervisory task?

15      A     Yes.

16      Q     And who would that be?

17      A     At the beginning that was Terry Shanahan and

18  Kristin Ferraro.

19      Q     When we say the very beginning, can you

20  provide a month and year as to when The O'Neil Group

21  began its operations?

22      A     I think I started in September of 2011.

1    Q    And when did Mr. Shanahan start, do you

2  recall?

3    A    I think he had started before I got there.

4  Maybe a month before.

5    Q    How did he get involved in The O'Neil Group?

6    A    I believe he had approached MCM and this is

7  all my understanding.  I wasn't a participant in any of

8  those conversations.  He had approached MCM about

9  opportunities for legal work related to their

10 properties.

11   Q    And how did it come to be that he just

12 approached them?

13        Did he approach them through you?  Did he

14 approach them because he knew someone there?

15   A    I don't really recall.  I probably had a

16 conversation with him.

17   Q    I mean was it just a pure coincidence that he

18 approached them and that the two of you had worked years

19 prior at Rotbert?

20   A    No, I think he knew Steve as well.

21   Q    So he knew one of the partners?

22   A    Yes.

```
1        Q      And how did he know one of the partners?

2        A      I'm sure through me.

3        Q      Through you, okay.

4        A      Yeah.

5        Q      Was it MCM that approached you guys then or

6   did you guys approach MCM?

7        A      Well, Terry and I weren't working together

8   when he first approached MCM.

9        Q      But when The O'Neil Group was finally founded

10  was it -- whose idea was it?

11              Was it MCM's idea or was it your idea or

12  Mr. Shanahan's idea or the two of you together?

13       A      My recollection is that it was MCM's.  MCM

14  requested that I come on but not as an employee of MCM

15  or BSI but to start my own firm and that Mr. Shanahan

16  and Ms. Ferraro would become employees of that firm.

17       Q      Now, had you previously worked with

18  Ms. Ferraro?

19       A      No.

20       Q      Mr. Shanahan had, hadn't he?

21       A      That's my understanding, yes.

22       Q      Who hired Ms. Ferraro?
```

```
1        A      I guess that would be Mr. Shanahan.  In that

2    first month I don't know if they were on BSI's payroll

3    because The O'Neil Group didn't have a payroll at the

4    time.  It was just starting.

5        Q      But once The O'Neil Group began would

6    Ms. Ferraro have been on The O'Neil Group's payroll?

7        A      Yes, she would have.

8        Q      And Ms. Ferraro's duties would have been

9    what?

10       A      Administrative.

11       Q      So it was the three of you working performing

12   the ultimate task of supervising these outside law

13   firms?

14       A      Correct.

15       Q      And did there come a time when that changed?

16       A      Yes, in October of 2015 we stopped that

17   function.

18       Q      Now, following the formation of The O'Neil

19   Group another entity was formed, correct?

20       A      Well, there were -- yes.

21       Q      MSO Legal Partners, correct?

22       A      Correct.
```

1     Q      What year was that formed, do you know?

2     A      I want to say 2013.

3     Q      And what was the purpose of MSO?

4     A      MSO was formed to actually do foreclosures in

5     the state of Maryland.

6     Q      I imagine that the foreclosure work had been

7     performed by some other firms in Maryland; is that

8     correct?

9     A      Yes.

10    Q      And how did it come to be that MSO began to

11    perform foreclosure work in the state of Maryland?

12    A      I think we had a discussion with MCM and BSI

13    and they indicated there was a need for that and so we

14    agreed to do it.

15    Q      They indicated the need?

16    A      Yes.

17    Q      And this is 2013?

18    A      I believe so, yes.

19    Q      So in 2013 did MSO just have one client?

20    Would it be BSI that would have --

21    A      Yes, that's correct.

22    Q      Would have one client that would -- excuse

```
 1        Q      Within the last year?

 2        A      Within the last three months, yes.

 3        Q      When did that plan -- when was that move

 4  anticipated?

 5        A      By who?

 6        Q      By the trust.

 7               When did the trust plan to move its business

 8  from BSI to Fay?

 9        A      I think they announced it two months ago.

10        Q      Do you know if MCM has been unhappy with BSI

11  for any reason?

12        A      I don't know.

13        Q      Now, after MSO began accepting referrals from

14  BSI, did you take any kind of CLEs or anything of that

15  nature to learn the intricacies of foreclosure

16  business -- of foreclosure legal work?

17        A      Not that I recall.

18        Q      Did you purchase any types of books to read

19  personally?

20        A      I read case law.  I don't recall that I

21  purchased any books personally.

22        Q      So you read case law but that would be it?
```

```
1        A      Yes.

2        Q      In Maryland?

3        A      Currently, no, only in D.C.

4        Q      Are you admitted in both Maryland and D.C.?

5        A      Yes.

6        Q      Any other jurisdictions?

7        A      No.

8        Q      What were Terrance Shanahan's duties with

9   respect to MSO?

10       A      He was more involved on a day-to-day basis.

11       Q      And is that true from the inception of MSO

12   Legal Partners?

13       A      Yes.

14       Q      Now, The O'Neil Group hired a number of

15   different lawyers to assist the work of MSO, correct?

16       A      Yes.

17       Q      Do you recall who those individuals are?

18       A      Well, the original M in MSO was Kurt Mueller

19   and after Kurt decided he wasn't going to continue with

20   that we hired Erik.

21       Q      That would be Erik Yoder?

22       A      Erik Yoder.  We hired Nida Hasan.
```

1      Q     Yes.

2      A     I think Kyle Blackstone did some work for MSO

3   although it wasn't his primary job then we hired Amanda

4   Joiner and I don't recall any others.

5      Q     Mr. Mueller, how did you get -- how did it

6   come to be that he was hired by The O'Neil Group?

7      A     He was an acquaintance of Mr. Shanahan's.

8      Q     Were you also acquainted with him?

9      A     No.

10     Q     And what kind of work was he hired to

11   perform?

12     A     Foreclosures and deeds in lieu.

13     Q     And do you recall what his dates of

14   employment were?

15     A     He was there from the beginning of MSO but

16   indicated that he was going to stop within two months I

17   believe.  It was a short period of time.

18     Q     Was there a particular reason why he stopped

19   working for MSO?

20     A     As reported to me by Mr. Shanahan, he had his

21   own practice that was busy and he couldn't devote the

22   time to MSO that it required.  I didn't speak to Kurt

1    it have just been Mr. Shanahan?

2        A    I believe it was just Mr. Shanahan.

3        Q    Now, Mr. Yoder, do you recall when he began

4    working for MSO?

5        A    I believe it was in September or October of

6    2013.

7        Q    And about how much time had passed between

8    Mr. Mueller's departure and Mr. Yoder beginning his

9    work?

10       A    As I recall just about a month.

11            (O'Neil Deposition Exhibit 4 was marked for

12   identification and retained by counsel.)

13   BY MR. HOFFMAN:

14       Q    I'm going to show you what's been marked as

15   Exhibit Number 4.

16       A    Yes, I've seen it.

17       Q    Do you recognize this document?

18       A    Yes.

19       Q    What is this document?

20       A    It was a written offer of employment to Erik

21   Wells (sic) from The O'Neil Group.

22       Q    Did you prepare this document?

1      A      Yes.

2      Q      And he also had some sick personal days; is

3   that correct?

4      A      Yes.

5      Q      There's also a section with respect to the

6   amount of billable requirements or working hours; is

7   that correct?

8      A      Yes, that's what it says on page two.

9      Q      Is there any claim that Erik did not devote

10  sufficient time to complete the tasks that were expected

11  of him?

12     A      I don't believe so.

13     Q      Do you know if there's a signed copy of this

14  offer somewhere?

15     A      I have not seen it.

16     Q      So he was employed by The O'Neil Group,

17  correct?

18     A      This offer came from The O'Neil Group but he

19  worked for MSO.  MSO was really just an internal

20  division created to handle the foreclosure work.

21     Q      But he was paid by The O'Neil Group?

22     A      Yes, there wasn't a separate payroll for MSO.

```
 1        Q      He was promised employment by The O'Neil

 2   Group?

 3        A      Correct.

 4        Q      He was assigned by The O'Neil Group to work

 5   on MSO Legal Partner work?

 6        A      Yes, that's the way it was structured.

 7        Q      Now, were there any other attorneys between

 8   September 2013 and June 2014 working for The O'Neil

 9   Group other than yourself and Mr. Shanahan?

10        A      There was one other, yes.

11        Q      And who would that be?

12        A      Ben Sislen.

13        Q      And when was Ben hired?

14        A      He was an employee of BSI or MCM.  I'm not

15   exactly sure which.  I believe he was a BSI employee who

16   moved over to The O'Neil Group at some point in 2012 or

17   2013.  I don't remember exactly when.

18        Q      2012 or 2013 he moved from BSI to The O'Neil

19   Group?

20        A      Correct.

21        Q      And when did his employment -- when did he

22   separate from The O'Neil Group?
```

1    might expect in terms of foreclosure work in Maryland?

2        A    I think it was more generalized.  Almost

3    every pool had some loans in Maryland.  It would be

4    unusual that a pool had nothing in Maryland.  Some pools

5    would come to market that were 50 percent New York, New

6    Jersey and Florida but it was -- so there was always an

7    expectation that there was some Maryland work in every

8    pool but the specifics of how many -- if it was a big

9    pool we would assume there would be a good number of

10   Maryland loans.  If it was a small pool it would be

11   proportionate.

12       Q    In September of 2013 do you know how many

13   foreclosure referrals had been received by MSO from BSI?

14       A    I think it was less than 60.

15       Q    Less than 60?

16       A    In September I think it was a pretty small

17   number.  Yeah, maybe less than -- in the 30 to 40 range.

18       Q    By June of 2014 how many active foreclosures

19   was MSO involved in?

20       A    I'm not sure I know that number.  Again, I

21   think the spreadsheets that we produced showed the

22   referrals per month but it had gone up to I think more

1    when he walked out and we tried to maintain lines of

2    communication with him and he made it clear he wasn't

3    interested in that, we asked him to sign a release and

4    he wasn't interested in that and so I think I probably

5    did characterize it to him or to other people that okay,

6    if you're not going to cooperate then I'll grant your

7    wish and I'll say you're fired.

8              MR. HOFFMAN:  Let's have this marked as five.

9              (O'Neil Deposition Exhibit 5 was marked for

10   identification and retained by counsel.)

11   BY MR. HOFFMAN:

12       Q     I'm going to show you what's been marked as

13   Exhibit Number 5.  I'm going to ask you to review that

14   document.

15             Do you recognize this document?

16       A     I believe so.  I think it was -- yes, I

17   recognize it.

18       Q     Who prepared this document?

19       A     I believe Mr. Shanahan did.

20       Q     What kind of discussions did you have with

21   Mr. Shanahan concerning Mr. Yoder and his separation of

22   employment?

1    A    I mean I think we discussed what was going on

2  and I think we discussed beforehand the idea that we

3  would ask him to start looking for another job generally

4  and then during the course of the next week, he had a

5  discussion with Mr. Yoder which he then relayed what

6  that was about.  I told him what I had told Mr. Yoder.

7    Q    Is that the sum total of the subjects you

8  talked with him about?

9    A    About Mr. Yoder?

10    Q    Yes.

11    A    I believe so, yeah.

12    Q    Did you talk with Mr. Shanahan regarding

13  business conditions?

14    A    I'm not sure what you mean by "business

15  conditions."

16    Q    Anticipated numbers of foreclosure referral

17  work.

18    A    Yeah, on a general basis.  If I learned some

19  information I talked to Terry about it.

20    Q    Mr. Yoder was not simply reserved just to do

21  foreclosure work, correct?

22    A    Correct.  He was the head of the foreclosure

```
1      Q      Do you have any idea how much he was paid for

2   2014?

3      A      Total?

4      Q      Yes.

5      A      In extra compensation or just all of it?

6      Q      All compensation.

7      A      No, I don't know.

8      Q      What was the purpose of this resignation

9   letter?

10      A      Just to put a clean end on the relationship.

11      Q      What was the purpose of providing --

12   requiring Mr. Yoder not to disparage or demean the firm?

13      A      I don't know.  That was Mr. Shanahan's

14   verbiage.  I didn't have any input into that.

15      Q      You didn't review this at all before --

16      A      I'm sure I did.

17      Q      Did you think to yourself whether that

18   would -- whether that was in the form of like a

19   confidential type of agreement?

20      A      I'm sorry, the disparagement?

21      Q      Well, let me approach it a different way, I'm

22   sorry.
```

```
 1    billed and what we had been invoiced.

 2         Q    And what did she find?

 3         A    She found that it was a pervasive problem.

 4         Q    And how did this problem begin?

 5         A    Well, I mean I don't know exactly.  I've

 6    spoken to Kristin and Ms. Shanahan and Mr. Shanahan and

 7    Erik Yoder about it and what I believe happened is

 8    people made assumptions about what the title reports

 9    cost without actually seeing the invoices from our

10    vendor.

11         Q    The vendor being All Star?

12         A    At that time, yes.

13         Q    And was there any controls in place to have

14    prevented this?

15         A    Apparently not.

16         Q    Now --

17         A    There should have been.

18         Q    Now, has The O'Neil Group been involved in

19    auditing the expenses billed to BSI from other law

20    firms?

21         A    We reviewed them and if they were within

22    certain guidelines we would approve them.  If they
```

```
1       A       I believe we did, yes.

2       Q       And at this meeting who would have been

3  present?

4       A       I think just Erik and I.

5       Q       And what did you discuss?

6       A       The subject of this e-mail, the billing

7  error.

8       Q       So this would have been within a day or two?

9       A       As I recall, yes.  I treated it as an urgent

10  matter.

11      Q       And what did you say at this meeting?

12      A       I think we discussed how pervasive the

13  problem was and I think I confirmed for him that it

14  wasn't -- it wasn't the way it was supposed to be.  They

15  weren't supposed to bill the 350.  They were supposed to

16  bill the actual amount charged and that that had always

17  been the firm policy and that we would have to refund

18  the money.

19      Q       And what did he say?

20      A       I mean I think he agreed with me, that we had

21  to do research and find out how many times it had

22  happened and that we had to tell BSI about it.
```

```
 1        Q     And did you communicate with him via e-mail

 2   concerning these issues after the 12th?

 3        A     I believe I did, yes.

 4        Q     And what did you state via e-mail?

 5        A     I don't remember.  I would have to see the

 6   e-mails.

 7        Q     Do you know how this issue was left?

 8        A     I think I told him I would talk to Justin,

 9   that Kristin would do an investigation and that we would

10   figure out how much the refund was supposed to be.  I

11   don't recall if we discussed going forward how the

12   process would -- of creating invoices would be handled

13   but we recognized that we had to change and/or implement

14   a process since we didn't appear to have one.

15              MR. HOFFMAN:  Let's get this marked as

16   Exhibit Number 7.

17              (O'Neil Deposition Exhibit 7 was marked for

18   identification and retained by counsel.)

19   BY MR. HOFFMAN:

20        Q     I ask you if you've reviewed this document

21   previous to this deposition?

22        A     I think it was an exhibit in another
```

```
 1        Q     You write "I will take care of any necessary

 2   disclosures and please refrain from the ethics lectures.

 3   It makes me believe that the purpose of these e-mails

 4   over the past several days is other than informing me of

 5   your concerns."

 6              Did I read that correctly?

 7        A     That's what it says, yes.

 8        Q     It also adds "Moreover, the repeated

 9   insinuation that Terry is doing something wrong when I

10   am fully aware of the process is a bit much.  Please

11   stop it."

12              Did I read all that correctly?

13        A     That's what it says, yes.

14        Q     Now, by the time you wrote this e-mail were

15   you upset with Mr. Yoder?

16        A     I was concerned about the tone that he was

17   taking in his e-mails, yes.

18        Q     Well, were you upset with him as in angry in

19   any way?

20        A     My only anger stemmed from the fact that I

21   was on the way to my sister's funeral and I had told him

22   that several times and he didn't acknowledge it or agree
```

1    that way and I thought it was fairly unusual to accuse

2    the people you're working with on a regular basis of

3    somehow trying to do something nefarious and that was my

4    concern.

5         Q     I mean what purpose might he have had other

6    than of informing you of his concerns?

7         A     I couldn't really tell what he was trying to

8    get at but he was burying a lot of very damaging

9    accusations in our e-mail and suggesting that we weren't

10   doing anything about it when we were.

11        Q     These e-mails at least on the 18th of June

12   having to do with the Hurley Auctioneers?

13        A     Correct.

14        Q     And this was an issue that he also -- he had

15   brought up in relation to the issue of title charges,

16   correct?

17        A     I'm sorry, I don't understand that question.

18   I mean there's a reference to the title costs but this

19   was a different issue.

20        Q     This is a different issue but he says on

21   June 18th at least on the fifth page, "I meant to have

22   this discussion with you yesterday as it relates to

```
1       A     I think he said "If I had ulterior motives I

2   would have gone directly to MCM, BSI and Bar counsel

3   without apprising you of anything."

4       Q     I mean do you think that he had any kind of

5   ulterior motives?

6       A     I don't know but here we are litigating it

7   for the third time.

8       Q     Litigating it for the third time?  What do

9   you mean?

10      A     He filed a complaint with Bar counsel.  He

11  filed a complaint with the Department of Labor and then

12  he filed a complaint in Federal Court.

13      Q     And so you think that he was -- do you have

14  some reason to believe that he was trying to lead you

15  into some sort of litigation?

16      A     I don't know.

17      Q     I mean I'm asking you how you feel.

18      A     Well, it's hard in retrospect.

19      Q     It may be completely unsupportable.

20      A     How I felt then?  I thought his tone was

21  inappropriate.  That's what upset me most.  At that

22  point, no, I didn't -- when he brought up Bar counsel I
```

1   was a bit shocked and then when he brought up going to

2   BSI and MCM directly, I thought that was inappropriate

3   as well.

4        Q    He further indicates "If I took a stern or

5   harsh tone this past week it's because I'm frustrated

6   with a lack of concern which as of last week can now

7   affect me personally as a trustee and the sole attorney

8   put in charge of your foreclosure practice entirely."

9             Did I read that correctly?

10       A    That's what it says, yes.

11       Q    Your response was approximately half an hour

12   later and you responded back to him; is that correct?

13       A    Yes, that's what it says.  Well, 45 -- yeah,

14   35 minutes later.

15       Q    And you said "We're looking into the title

16   costs and agreed to fix any problem we find"; is that

17   right?

18       A    Well, he complained that he hadn't been

19   getting a reaction and I said "Let's be clear.  You

20   raised the title cost issue late last week and the

21   auction issue this morning."

22       Q    Now, had the meeting that you said occurred

1    chance to meet with him on the 18th because you were on

2    your way to Philadelphia and on the 19th because you're

3    still at the funeral and on the 20th both of you might

4    have been out of the office on Friday, the 20th?

5         A     It's possible, yeah.

6         Q     On the 21st and the 22nd do you think you met

7    with him?

8         A     No.

9         Q     So now we have June 23rd as the next

10   opportunity for the two of you to meet and discuss this?

11        A     Hypothetically, yes.

12        Q     So maybe we don't have the date but do you

13   recall the next instance in which you communicated with

14   Mr. Yoder?

15        A     No, I don't recall specifically but I know we

16   continued the discussion.

17        Q     When did you continue the discussion?

18        A     I don't know.

19        Q     Do you know when Mr. Yoder -- do you know

20   when you asked Mr. Yoder to begin looking for another

21   job?

22        A     I think it was the end of June.

1      Q      Did he say anything else?

2      A      Well, we had some discussion about that but I

3   don't recall anything else.

4      Q      What was the discussion?  Can you be as

5   specific as possible?

6      A      As specifically as I recall I told him that I

7   didn't -- I wasn't firing him but that the financial

8   condition of the firm meant that we weren't going to be

9   able to pay him not only what he was making then but

10   what he wanted to make in the future and that he would

11   be better off looking for another job.

12      Q      And what was his response?

13      A      I think he just reiterated that we were

14   firing him.

15      Q      I mean do you have any recollection beyond

16   just that iteration?

17      A      No.

18      Q      When you say that was the primary factor, is

19   there any other secondary factors?

20      A      No, I don't think so.

21      Q      Did you generally find him to be fairly

22   competent?

1    billed as far as I know.

2         Q    What I'm trying to understand is does

3    Mr. Yoder's job involve actually processing invoices?

4         A    If he got an invoice he would confirm it was

5    accurate and hand it to somebody to make sure it got

6    paid.

7         Q    So beyond these filings and the Harvey West

8    invoices was there anything else that you discovered?

9         A    Not that I recall.

10        Q    Now, what about Mr. Yoder's interactions with

11   BSI, any personnel from BSI or MCM?

12        A    No, I don't recall.  I know he interacted

13   with some of the processors on the BSI side on occasion

14   but I never -- I don't recall any complaints from BSI.

15        Q    Do you know if they had any kind of --

16   whether anybody from BSI ever provided you with an

17   opinion of Mr. Yoder at all?

18        A    No, I don't recall that.

19        Q    So is it your position then that the

20   justification for asking him to look for another job was

21   solely based on the economic circumstances?

22        A    Yes.

1        Q     And what documents other than anything you've

2   described already would support your contention?

3        A     My contention that that's what it was based

4   on?

5        Q     Yes.

6        A     I don't know that I wrote any documents about

7   that.

8        Q     You've indicated, for example, that there's

9   an e-mail from a partner at MCM to you?

10       A     Yes.

11       Q     You'll look for that e-mail?

12       A     Yes.

13       Q     The spreadsheet that you provided, does that

14  show the amount of foreclosures that were being received

15  in 2015?

16       A     I believe it does.  You represented that it

17  only goes through November of 2015.

18       Q     Now, does the change -- I guess the

19  organizational change that occurs in late October of

20  2015 as reflected on Exhibit 3, does that have anything

21  to do with Mr. Yoder's separation?

22       A     No, I don't believe so.

1       Q      Because that has more to do with The O'Neil

2    Group's work?

3       A      Correct.

4       Q      And Mr. Yoder was not involved in The O'Neil

5    Group's work as -- well, I should say its supervisory

6    work over outside counsel?

7       A      That's correct.

8       Q      Now, at what point did you conclude that

9    business conditions would not permit Mr. Yoder's

10   continued employment?

11      A      Well, I was concerned about it for the three

12   months leading up to it and then when MCM failed to

13   purchase any loans in late June when they were expecting

14   them, that was kind of the tipping point.

15      Q      It was kind of the tipping point?

16      A      Yeah.

17      Q      Now, I should be more precise.

18             You and Mr. Yoder continued to converse or

19   communicate by e-mail into July of 2014, correct?

20      A      I believe that's right, yeah.

21             MR. HOFFMAN:  Let's have this marked.

22             (O'Neil Deposition Exhibit 10 was marked for

1    identification and retained by counsel.)

2    BY MR. HOFFMAN:

3        Q      Now, on the second and third page it sort of

4    trails on.  You wrote -- this is on June 30th at 12:30.

5    You wrote to Mr. Yoder.  "I offered to pay you through

6    the end of July while you look for another job but that

7    offer remains open despite you walking out today.

8    However, you will need to sign the attached.  If you do

9    not want to resign then I will accommodate your

10   insistence that you be fired.  Let me know which one of

11   those two options you prefer."

12              Did I read that correctly?

13       A      Yes.

14       Q      And the attached would have been the letter

15   of resignation?

16       A      Correct.

17       Q      And the letter of resignation that

18   Mr. Shanahan had prepared?

19       A      Yes.

20       Q      And in essence, what you were communicating

21   there is that he either sign the letter of resignation

22   indicating that he was quitting or that he would be

1    fired?

2        A       Ineloquently stated but yes.

3        Q       But there were only two options?   You

4    indicated that.

5        A       Yes.

6        Q       And those two options would be -- what would

7    be the first option?

8        A       That he continue his employment, keep getting

9    paid through July while he looks for another job.

10       Q       He would be released of any kind of work

11   duties through July though?

12       A       He would not be obligated to do anything.

13       Q       He would not be obligated to perform any

14   work, correct?

15       A       Correct, but he would get paid.

16       Q       He would get paid.

17               But of course that's not what he was hired to

18   perform, to do nothing, correct?

19       A       Correct.

20       Q       So his actual work was going to cease?

21       A       No, the option -- I wanted to give him a full

22   opportunity to look for another job.

```
1                  Is there any e-mails either prior to or

2    subsequent to this e-mail which further explain his

3    options?

4        A     Okay, I see what you're saying.  No, I guess

5    those are his two options.  I didn't think I made

6    signing the resignation letter part of staying on but

7    the way this is written that's what it sounds like.  I

8    would have been happy for him to say I'll continue

9    working.  I'll dedicate myself full-time to the job and

10   you'll pay me through the end of July.  I was telling

11   him that that offer was still on the table.

12       Q     But that offer required him to sign the

13   letter?

14       A     That's what it says in this e-mail, right,

15   which is somewhat inconsistent.

16       Q     It's inconsistent with what you're saying

17   here in 2017?

18       A     It's inconsistent with what I said before.  I

19   mean when I first told him to look for another job I

20   didn't give him a resignation letter.  Terry drafted the

21   resignation letter after he walked out.

22       Q     How is this different from quit or be fired?
```

```
 1      A      Because that wasn't -- the first option

 2   wasn't quit.  The first option was I'll continue to pay

 3   you while you look for work.

 4      Q      Through such and such date?

 5      A      Right.

 6      Q      And what would happen at such and such date?

 7      A      I think we discussed that already.  I don't

 8   know.  We would have reevaluated.

 9      Q      Is there anything in any of these e-mails

10   that suggested that after the end of July there would be

11   a reevaluation?

12      A      I don't see that word but what I told him

13   when the offer was first made was that he could continue

14   to get -- all I could commit to was to pay him through

15   the end of July.

16      Q      Why offer him an additional -- why offer him

17   what's referred to in Exhibit 5 as an additional $1,000?

18      A      I think it was consideration for the deal.

19      Q      Consideration for all of the items that are

20   set forth there?

21      A      Correct.

22      Q      By the way, has The O'Neil Group or MSO Legal
```

1    Partners ever had to ask for a letter of resignation?

2        A    No.

3        Q    Other than for Mr. Yoder?

4        A    Correct.

5        Q    Now, on July 7th according to the first page

6    of Exhibit 10 you again write to Mr. Yoder, correct?

7        A    Correct.

8        Q    Now, by this point in time Mr. Yoder is not

9    in the office?

10       A    Correct.

11       Q    Is he making himself available to assist with

12   any files or any kind of questions of any kind?

13       A    Not that I know of, no.

14       Q    And you write to him and you indicate --

15       A    But I don't know that we asked him anything.

16       Q    I'm sorry?

17       A    I'm not saying -- I don't know that we asked

18   him anything during that time period.  I wasn't

19   suggesting that we were asking him for information and

20   he was ignoring us but I don't believe he was doing any

21   work.

22       Q    That's fair.  Between June 30th, and that's

1    aware of them.  We've never had this issue come up

2    before.

3         Q     You've had other people quit?

4         A     Correct.

5         Q     Do you pay them $1,000 for their release?

6         A     No.

7         Q     So what was different about this than when

8    somebody voluntarily quits and you don't pay them?

9         A     Because he was mischaracterizing it as a

10   termination.  Nobody else has done that before.  I think

11   that's what spurred Mr. Shanahan into drafting the

12   release.

13        Q     So you're insisting that it was he that was

14   mischaracterizing it as a termination and not you

15   mischaracterizing it as a quit?

16        A     I believe he mischaracterized it as a

17   termination and by -- I didn't want to fire him.  By

18   July 7th I just said okay, we'll just consider June 30th

19   your last day of work.

20        Q     I have no problems believing that you didn't

21   want to have this marked as a termination because you

22   understood how that would look.

```
 1   defense, the fourth affirmative defense reads "Each

 2   action by defendants that affected the plaintiff was

 3   taken in good faith with proper motive or for

 4   legitimate, proper or lawful purposes."

 5              Did I read that correctly?

 6       A     Yes.

 7       Q     And the factual basis for that affirmative

 8   defense is everything you've already described in this

 9   deposition?  For example, the primary motive being an

10   economic one?

11       A     Yes, I believe that's correct.

12       Q     The fifth affirmative defense reads that "The

13   plaintiff's complaint is barred in whole or part by the

14   after acquired evidence doctrine."

15              Did I read that correctly?

16       A     Yes.

17       Q     What facts support that defense?

18       A     I think we've discussed those as well today

19   here, the condition of the files after he left the firm.

20       Q     The conditions of what files?

21       A     The incomplete pleadings, the unprocessed

22   bills.
```

1    which may have been helpful on that point.  I'll get to

2    raise the issue during his deposition.

3        Q    What's that?

4        A    I'll get to raise the issue during his

5    deposition I'm sure.

6        Q    I think this is more in the form of an

7    objection right now as opposed to some testimony.

8        A    No, this is testimony.

9        Q    Is it testimony?

10       A    Yes.

11       Q    Either way, as you sit here today you don't

12   have any evidence to support this but you are hoping to

13   find some at his deposition?

14       A    Correct.

15       Q    The seventh affirmative defense indicates

16   that "The defendants would have made the same decision

17   and taken the same actions absent any alleged complaint

18   by the plaintiff."

19       A    Correct.

20       Q    What factual basis supports this affirmative

21   defense?

22       A    I think it's everything we've been talking

1    about today.

2         Q      Everything being your contention that

3    business was on the decline?

4         A      Correct.

5         Q      And that Mr. Yoder needed to cease performing

6    work for The O'Neil Group?

7         A      That he needed to look for another job.

8         Q      Is there a difference between his need to

9    look for another job and his needing to not perform work

10   for the -- his services were no longer necessary?

11        A      Yeah, there is a difference.  I was going to

12   pay him for the month and I never told him to cease

13   work.  I told him he didn't have to work.  He could

14   dedicate his time to looking for another job so yes, I

15   contend there is a difference.

16        Q      Do you believe that his services were no

17   longer necessary?

18        A      I don't think we had the revenue to support

19   his services going forward and that the firm had

20   adequate resources to perform the work that was

21   necessary without him there.

22        Q      Business had turned down according to you,

1       Q      Well, you went into some discussion and I

2    submit to you that this discussion is not accurate.  The

3    cause of these --

4       A      It's not the full story, that's for sure.

5       Q      The cause of this billing error has nothing

6    to do with Yoder failing to accurately communicate with

7    those creating the invoices because he refused to use

8    the case management software?

9       A      I disagree.  With the case management

10   software you can load up the invoices and it can track

11   costs and expenses for you but we apparently weren't

12   using that feature.  Invoices were coming into Erik but

13   he wasn't creating the subsequent invoice to BSI nor was

14   he checking the invoices that Sallie was making.

15   Everybody was -- I'm not saying it was all Erik's fault.

16   Everybody made errors in this process.

17      Q      Now, you sat through the last four

18   depositions?

19      A      Yes.

20      Q      The last four depositions seem to make it

21   very clear that this was Sallie Shanahan billing out at

22   350 for every title report because she understood that