

PLAINTIFF'S
EXHIBIT
2

In the Matter Of:

# ERIK YODER

*vs.*

# THE O'NEIL GROUP, LLC, et al.

---

# TERRANCE SHANAHAN

## January 19, 2017

---

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3

 4   ERIK YODER,                   *

 5             Plaintiff,          *

 6        vs.                      *   Civil Action

 7   THE O'NEIL GROUP, LLC,        *   No. 8:16-CV-00900 DKC

 8   et al.,                       *

 9             Defendants.         *

10

11

12        Oral Deposition of TERRANCE J. SHANAHAN

13                  Rockville, Maryland

14              Thursday, January 19, 2017

15                     1:11 p.m.

16

17

18

19   Job No.: WDC-111412

20   Pages 1 - 163

21   Reported by:  Vicki L. Forman

22
```

```
 1                 Oral Deposition of TERRANCE J. SHANAHAN,

 2    held at the offices of:

 3

 4             DTI Deposition Services

 5             21 Church Street, Suite 150

 6             Rockville, Maryland  20850

 7             (301) 762-8282

 8

 9

10

11                 Pursuant to agreement, before Vicki L.

12    Forman, Court Reporter and Notary Public in and for the

13    State of Maryland.

14

15

16

17

18

19

20

21

22
```

```
 1              A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4       HOWARD B. HOFFMAN, ESQUIRE

 5       Law Office of Howard B. Hoffman

 6       600 Jefferson Plaza, Suite 304

 7       Rockville, Maryland  20852

 8       (301) 251-3752

 9

10

11

12    ON BEHALF OF THE DEFENDANTS:

13       WILLIAM T. O'NEIL, ESQUIRE

14       The O'Neil Group, LLC

15       Suite 1375

16       7500 Old Georgetown Road

17       Bethesda, Maryland  20814

18       (202) 684-7140

19

20

21

22
```

```
 1                  C O N T E N T S

 2   EXAMINATION OF TERRANCE J. SHANAHAN          PAGE

 3          By Mr. Hoffman                          6

 4

 5

 6

 7          C E R T I F I E D   Q U E S T I O N S

 8          "Did you perform when you were in the    19

 9   U.S. Navy any types of legal tasks?"

10          "Can you tell me whether you worked      19

11   with any lawyers for the U.S. Navy?"

12          "Does that include having nothing to     21

13   do with the administration of employment laws?"

14

15

16

17

18

19

20

21

22
```

```
 1                    E X H I B I T S

 2                  (Retained by Counsel)

 3    T. SHANAHAN DEPOSITION EXHIBIT                    PAGE

 4    Exhibit 1   1/7/14-1/8/14 E-mail String, TOL006816   65

 5    Exhibit 2   6/18/14 E-mail String, TOL006996         71

 6    Exhibit 3   1/8/14 E-mail String, TOL007636-7637    129

 7    Exhibit 4   1/9/14 E-mail, TOL007638                131

 8    Exhibit 5   6/18/14 E-mail String, TOL008074        141

 9    Exhibit 6   6/18/14 E-mail String, TOL008079-8080   141

10    Exhibit 7   6/17/14 E-mail, TOL006989               146

11    Exhibit 8   6/18/14 E-mail String, TOL008070-8073   146

12    Exhibit 9   6/23/14 E-mail String, TOL007132        152

13    Exhibit 10  6/12/14 E-mail, TOL006972               155

14    Exhibit 11  1/7/14 E-mail, TOL007617                155

15    Exhibit 12  6/17/14 E-mail String, TOL006986        157

16

17

18

19

20

21

22
```

```
 1        A     J.D.

 2        Q     And when did you get a law degree?

 3        A     2002.

 4        Q     And where did you get your law degree?

 5        A     University of Maryland.

 6        Q     Did you take any courses in employment law?

 7        A     No.

 8        Q     Did you take any courses in labor law?

 9        A     No.

10        Q     Was there any specific practice areas that

11  you sought to enter while you were in law school?

12        A     Transactional work generally speaking.

13        Q     Transactional being business related work?

14        A     Business, you know, transactions, yeah.

15        Q     Do I understand that you were an evening

16  student?

17        A     I don't know.  Do you?

18        Q     Well, did you work while you were at the

19  University of Maryland?

20        A     Yes.

21        Q     And what did you work doing?

22        A     I was in the U.S. Navy.
```

| | | |
|---|---|---|
| 1 | Q | And within the U.S. Navy what were you doing? |
| 2 | | Did you have a rank? |
| 3 | A | Of course I had a rank. |
| 4 | Q | Well, you could have been a civilian for the |
| 5 | | U.S. Navy, correct? |
| 6 | A | No, I was in the U.S. Navy.  I was in the |
| 7 | | U.S. Navy. |
| 8 | Q | Okay, very good. |
| 9 | | You were in the U.S. Navy and what was your |
| 10 | | rank or commission? |
| 11 | A | I was a Chief Petty Officer. |
| 12 | Q | And from what point in time to what point in |
| 13 | | time did you serve in the U.S. Navy? |
| 14 | A | 1980 to 2001. |
| 15 | Q | So you left the U.S. Navy shortly prior to |
| 16 | | graduation from law school? |
| 17 | A | I retired, yes. |
| 18 | Q | And did you perform any kind of legal tasks |
| 19 | | of any nature when you were in the U.S. Navy? |
| 20 | A | I'm not going to talk about what I did while |
| 21 | | I was in the Navy. |
| 22 | Q | Is it classified? |

1              MR. O'NEIL:  How is it relevant to the issue

2     we're here to talk about today?

3              MR. HOFFMAN:  Well, I'd like to get some

4     information on him as a witness and I'm proposing that

5     we'll move on but a refusal to answer a question is not

6     something that I accept.

7        A      Okay.

8     BY MR. HOFFMAN:

9        Q      So is your assignments at any point in the

10    U.S. Navy classified or otherwise assigned some sort of

11    top secret information or label that would prevent you

12    from being able to testify today?

13       A      Your question was not what my assignments

14    were but what I did; is that correct?

15       Q      What you did.

16       A      So what I did at the time I did it things

17    were classified.  Whether they've been declassified or

18    not I know not.  Therefore, I'm not willing to risk

19    giving you information that may or may not have been

20    declassified.  If you want to know where I was stationed

21    I'll answer those questions.

22       Q      Well, let's assume you were stationed in

1    Maryland because you went to the University of Maryland

2    at least at the time you retired, correct?

3         A    Yes.

4         Q    Did you perform when you were in the U.S.

5    Navy any types of legal tasks?

6         A    I just commented on what I would say about

7    the Navy.  I won't answer questions about what I did.

8    I'll tell you where I was.

9              MR. HOFFMAN:  We're going to certify that

10   question.

11   BY MR. HOFFMAN:

12        Q    You do understand that we'll be coming back

13   for that answer?

14        A    Sure.

15        Q    Is there anything that you can tell me about

16   your service in the Navy?

17        A    Yes, I loved it.

18        Q    Okay, that's good.  Anything else?

19        A    No.

20        Q    Can you tell me whether you worked with any

21   lawyers for the U.S. Navy?

22        A    No.

```
 1       Q      You did not or you can't tell me?
 2       A      I'm not going to comment about what I did in
 3    the Navy.
 4              MR. HOFFMAN:  Okay, we'll certify that.
 5       A      Okay.
 6    BY MR. HOFFMAN:
 7       Q      Did you have any human resource
 8    responsibilities in the U.S. Navy?
 9       A      Notwithstanding my previous objection that I
10    wasn't going to comment about what I did in the Navy, I
11    was a Chief Petty Officer in the United States Navy.
12    That's a leadership role.
13       Q      What I'm asking you is whether or not you
14    were assigned any type of human resource type functions.
15       A      What would be a human resource function?
16       Q      Anything having to do with the hiring or
17    firing of civilian Navy personnel.
18       A      I don't think I had anything to do with any
19    civilians.
20       Q      Did you have anything to do with the
21    administration of employment laws with respect to
22    civilian employees?
```

```
 1                 MR. O'NEIL:  Object to the question.  He just
 2     said he didn't have anything to do with civilians.
 3                 MR. HOFFMAN:  Well, let him answer the
 4     question.
 5                 MR. O'NEIL:  Object to the form, asked and
 6     answered.
 7     BY MR. HOFFMAN:
 8         Q     Is that a no?
 9         A     I didn't do anything with civilians.
10         Q     Does that include having nothing to do with
11     the administration of employment laws?
12         A     I didn't do anything with civilians.
13         Q     Is that a yes or a no?
14         A     To what question?
15         Q     To the question I just posed to you.
16         A     I'm not going to comment further.
17                 MR. HOFFMAN:  We're going to certify that
18     question.
19     BY MR. HOFFMAN:
20         Q     Have you ever had any training whatsoever at
21     any point in time with respect to employment laws?
22         A     No.
```

```
1        Q      Have you ever attended any employment law

2   seminars?

3        A      Not that I can recall.

4        Q      Have you as an attorney ever worked for any

5   lawyers that have worked in the employment law area?

6        A      I don't think so.

7        Q      After your graduation did you take a job with

8   an attorney or law firm?

9        A      After my graduation from law school?

10       Q      Yes.

11       A      I was already working at a law firm.

12       Q      And you were working as a law clerk during

13  the day; is that right?

14       A      Yeah.

15       Q      And what law firm were you working for?

16       A      I worked at Foran, Sonntag & Driscoll.

17       Q      Where are they located?

18       A      Greenbelt, Maryland.

19       Q      What type of work do they do?

20       A      PI, med mal, Social Security and some

21  workers' comp.

22       Q      Sort of a general plaintiff's practice, is
```

1    that fair?

2        A     I did.  You would have to ask them how they

3    characterize it.  I'm telling you what areas I know they

4    worked in.

5        Q     Did they only represent individuals or did

6    they represent businesses?

7        A     I don't know.  I mean I know they represented

8    individuals.  I don't know if they represented

9    businesses.

10        Q     Was there a supervising attorney that you

11    reported to?

12        A     No.

13        Q     Who did you report to?

14        A     Whatever attorney assigned me work so do that

15    work, tell them what I did.

16        Q     What dates of employment did you have?

17        A     Maybe like March of 2002 until sometime in

18    the fall of 2002.

19        Q     So shortly after your graduation you left

20    there?

21        A     Well, if May until the fall is shortly then

22    sure.

```
 1        Q      Okay.  How would you describe it?

 2        A      Well, I didn't leave two weeks after

 3   graduation is what I'm saying.

 4        Q      But you certainly didn't spend the amount of

 5   time you spent in the U.S. Navy there, did you?

 6        A      No, but I took the bar exam.  I worked there

 7   for a little while after I took the bar exam.

 8        Q      Did you work for them while you took the bar

 9   exam?

10        A      Yes.

11        Q      And did you pass the bar exam in 2002?

12        A      Yes.

13        Q      Did you take any other bar exams?

14        A      Yes.

15        Q      What other bar exams?

16        A      Arizona and California.

17        Q      Did you have some intention on relocating to

18   those areas?

19        A      Well, when I sat for the Arizona bar I

20   already -- I lived in Arizona.

21        Q      So let's take it chronologically.

22               After you left this Greenbelt firm you went
```

```
 1    where?  Did you go to another employer?

 2        A     Yes.

 3        Q     And who was that?

 4        A     I worked for Chesapeake Law Group.

 5        Q     Where are they located?

 6        A     In Baltimore.

 7        Q     What kind of work do they do?

 8        A     You're speaking in present tense.  That firm

 9    is no longer in existence but transactional work.

10        Q     Transactional work being business related?

11        A     Yep.

12        Q     And what were your dates of employment, do

13    you recall?

14        A     I don't know exactly when I started there.

15    It was in the fall of 2002 and then I left there in

16    March of 2003.

17        Q     When you left in March 2003 did you begin

18    employment elsewhere?

19        A     I just went out on my own.

20        Q     You opened your own practice?

21        A     Yeah.

22        Q     Did you have an office?
```

```
 1      A      Yes.

 2      Q      Where was your office?

 3      A      Baltimore.

 4      Q      What kind of work did you handle?

 5      A      Same thing, transactional.  I did some

 6   consumer bankruptcy work for the debtor side.

 7      Q      Had you taken bankruptcy in law school?

 8      A      No.

 9      Q      Did you receive any kind of awards, Book

10   Awards or anything of that nature while in law school?

11      A      What are Book Awards?

12      Q      Well, did you ever receive a -- was it not

13   called a Book Award when you were there?

14             Did you graduate with honors?

15      A      No.

16      Q      A Book Award at least when I was there would

17   have been when you would have received the highest grade

18   in a class in say criminal law?

19      A      I never received the highest grade in class.

20      Q      How long did you work as a solo practitioner?

21      A      A few months.  I'm going to say not more than

22   a year.
```

```
 1        Q      More than a few months but less than a year?

 2        A      Well, I don't know how you're quantifying a

 3    few.  I mean I would say maybe 9 to 11 months I had my

 4    own practice.

 5        Q      And where did you begin working after that?

 6        A      Francomano & Karpook.

 7        Q      Where are they?

 8        A      Baltimore.

 9        Q      And what type of work do they do?

10        A      They do a number of things.  I was of counsel

11    there so I just continued doing -- I had the same

12    clients.  I just continued doing the same kind of work I

13    had been doing.

14        Q      When you were a solo?

15        A      Yeah.

16        Q      And how long did you work in this position?

17        A      I was only there a couple of months.

18        Q      And after that where did you go?

19        A      I went to work for Mathon Management Company.

20        Q      What kind of work did you do for them?

21        A      Transactional.  I also oversaw litigation so

22    hiring of outside counsel.
```

1      Q      How did you get this position?

2      A      My brother-in-law was a principal at a

3   related company.

4      Q      And what company was that?

5      A      I don't remember the name of it but I mean he

6   might have been a principal at Mathon Management too.  I

7   don't know.

8      Q      Were they located in Maryland?

9      A      No, Mesa, Arizona.

10     Q      Do you ever talk to your wife about the kind

11  of practice work that you do?

12     A      I mean she knows generally what I do but I

13  don't talk to her about specifics.

14     Q      But she knows the areas of law that you

15  practice?

16     A      Yeah.  I mean for instance she knows I don't

17  do criminal law.  She knows I -- you know, she knows I

18  don't do personal injury work.

19     Q      When did you leave Mathon?

20     A      2005.

21     Q      Did you go somewhere else and work as an

22  attorney?

1       A       Yep.

2       Q       Where is that?

3       A       Rockville, Maryland.

4       Q       So you returned to Maryland to work in

5    Rockville, Maryland?

6       A       Yeah.

7       Q       For who?

8       A       Rotbert Law Group.

9       Q       And what kind of work do they do?

10      A       We had a varied practice.  Some of the

11   attorneys there did litigation.  I did transactional

12   work.

13      Q       How did you obtain that job?

14      A       I met the managing partner in the course of a

15   litigation.

16      Q       When you were working at Mathon?

17      A       Yes.

18      Q       So you continued to do transactional work?

19      A       Yes.

20      Q       Were you forming businesses?

21      A       Business formation, JV agreements, private

22   placements of securities, leasing, real estate

1    purchases.

2        Q       Any foreclosure work?

3        A       No.

4        Q       Up until now had you done any foreclosure

5    work in any other positions?

6        A       No.

7        Q       And when did you leave Rotbert?

8        A       February of 2006.

9        Q       Did you go somewhere else?

10       A       I went back out on my own.

11       Q       And how long were you out on your own?

12       A       Until about -- full-time probably until about

13   September of 2008.

14       Q       And did you begin working somewhere else in

15   September 2008?

16       A       Yes.

17       Q       And where did you begin working?

18       A       MetLife.

19       Q       MetLife?

20       A       Yeah.

21       Q       What did you do for them?

22       A       I was a registered rep.

```
 1        Q      Like to sell different life insurance or

 2    insurance products?

 3        A      Insurance and investments, yeah.

 4        Q      When did you leave MetLife?

 5        A      December 2010.

 6        Q      Did you become employed somewhere else in

 7    December 2010?

 8        A      Yeah, Margolis, Pritzker, Epstein & Blatt.

 9        Q      Why didn't you just start off with that?  I

10    know Jeff Pritzker well.

11        A      Okay.

12        Q      So in December 2010 you go to work for them?

13        A      Right.

14        Q      When did you leave?

15        A      July of 2011.

16        Q      Had you done any kind of debt collection work

17    at Margolis?

18        A      Sure, that's their whole practice.

19        Q      That's why I asked the question.  It's

20    possible that you were continuing to do transactional

21    work.

22        A      Yeah.  I mean my primary function was, you
```

1     know, debt collection practice.

2         Q      Consumer debts?

3         A      Yeah.

4         Q      Would you go into court to litigate those?

5         A      Yeah.

6         Q      And did you do anything else other than

7     consumer debts?

8         A      I did some side work that the firm sanctioned

9     so stuff for small businesses, reviewing leases, stuff

10    like that.

11        Q      They do do work on behalf of small

12    businesses, correct?

13        A      Margolis Pritzker?

14        Q      Yes.

15        A      Yeah.  I mean I think Jeff has a practice

16    like that.

17        Q      Right.  Had you done any foreclosure work

18    there?

19        A      No.

20        Q      Do they do foreclosure work?

21        A      When I was there?

22        Q      Yes.

```
 1    would be vetting all that and doing their due diligence

 2    so we would kind of know that hey, in Maryland there's

 3    going to be -- and this is totally a hypothetical but we

 4    just bought a pool.  There are 50 loans in Maryland.

 5    Now, whether or not that 50 loans trickles down to us,

 6    we wouldn't necessarily know that.  You don't know

 7    you're getting a referral.  The referral is not a

 8    referral until it's --

 9        Q     It's a referral.

10        A     Until it's referred, yeah.

11        Q     Right, but you would have an idea as to a

12    pool?

13        A     Yes.

14        Q     So did you necessarily have an idea with

15    respect to a pool or did you just sort of stumble on

16    that information?

17              How did you get that?

18        A     I mean we would know when they won a bid on a

19    pool.

20        Q     And forgive me if I'm missing something but

21    why would you as lawyers for The O'Neil Group and MSO

22    know when the investor -- is it MCM Capital?
```

1       A       Uh-huh.

2       Q       Would purchase a pool?

3       A       Because that sets in motion a whole bunch of

4    things that need to happen but in our capacity as The

5    O'Neil Group, we would have to -- because we would have

6    to alert our preferred counsel that hey, they just won a

7    pool.  This is when we think it's going to board meaning

8    it's going to be ready to work on and some period of

9    time after that you could expect about this many loans

10   in your jurisdiction.

11      Q       So you would give your outside counsel a

12   heads up?

13      A       Yeah, because they may have to scale for that

14   work.

15      Q       And when you say "scale," meaning they might

16   have to scale up?

17      A       Yeah, they might have to hire additional

18   people.

19      Q       Is that common for a foreclosure firm to have

20   ebbs and flows in the referral process?

21      A       Yes.

22      Q       Now, Erik Yoder comes on board and he was

1    promised how much in salary, do you recall?

2        A     I don't.  I would have to look at the

3    agreement.

4        Q     Was he given an employment agreement at

5    first?

6        A     Yeah, I believe so.

7        Q     By the time Erik Yoder has been hired had you

8    taken any foreclosure seminars or CLEs or training of

9    any sort?

10       A     I don't recall.

11       Q     Were you handling foreclosure work between

12   Mr. Mueller and Mr. Yoder?

13       A     I mean I certainly was assisting but again, I

14   don't recall if there was a gap.  You know, I don't

15   recall because -- yeah, I just don't recall if there was

16   a gap.

17       Q     Now, as an attorney you would agree with me

18   that a lawyer is simply not competent in every practice

19   area?

20       A     That's true.

21       Q     I mean as I sit here today I am not competent

22   in foreclosure work and there's a multitude of areas --

```
 1       A     I don't really know.  It wasn't -- yeah, I

 2   don't know exactly how many there were.

 3       Q     Who was responsible for the foreclosure

 4   practice at the time on let's say January 1, 2014?

 5       A     Mr. Yoder was.  I mean it was his program to

 6   run.

 7             MR. HOFFMAN:  Let's have this marked as T.

 8   Shanahan Exhibit 1.

 9             (T. Shanahan Deposition Exhibit 1 was marked

10   for identification and retained by counsel.)

11   BY MR. HOFFMAN:

12       Q     I'm showing you what's been marked as

13   Terrance Shanahan Exhibit 1.

14             Do you recognize this document?

15       A     I mean it's an e-mail.

16       Q     Yes, you're right, it is an e-mail.  Take

17   your time and familiarize yourself with it if you need

18   that.  Let me know when you're done.

19             (Pause in the proceedings.)

20       A     Okay, I've read it.

21       Q     This is an e-mail between you and Erik Yoder;

22   is that right?
```

1    to?

2       A       People that work in my office that schedule

3    sales.

4       Q       At MSO?

5       A       Yes.

6       Q       And who works at MSO presently?

7       A       Kristin Ferraro, Amanda Joiner.

8       Q       And so MSO is still involved in selling --

9    excuse me, in the foreclosure process?

10      A       Yeah.

11      Q       Now, after you referred to doomsday scenarios

12   you wrote "FWIW" which I interpret to mean for what it's

13   worth.

14      A       Right.

15      Q       "For what it's worth he's been the attorney

16   in charge of foreclosure for MSO."

17              Did I read that correctly?

18      A       You did.

19      Q       Does that mean that up until this point in

20   time he was in charge of foreclosure work?

21              Actually let me ask it this way:  Does it

22   mean what it sounds like?

1       A       What does it sound like?

2       Q       It sounds like he's in charge of foreclosure

3   for MSO.

4       A       Yeah, that was his area of responsibility.

5       Q       So you were deferring -- what you meant by

6   this paragraph is that you were deferring to his

7   expertise; is that correct?

8       A       His expertise.

9       Q       Would you agree with me that he had an

10  expertise in foreclosure work?

11      A       Yes.

12      Q       And you went on to further say that "I

13  haven't vetoed anything he wanted to do except insisting

14  we use CaseAware, which he's fought;" is that right?

15              Did I read that correctly?

16      A       Yes.

17      Q       Is there any evidence in any e-mails of any

18  sort of Mr. Yoder refusing to use CaseAware?

19              MR. O'NEIL:  Object to the form of the

20  question.

21      A       Well, yeah, right here.  I said it.

22

1       A       Did I make a recommendation?

2       Q       Yes.

3       A       Well, I will say that in June of 2014 I was

4   on vacation and I was reading e-mails that went back and

5   forth between Mr. Yoder and Mr. O'Neil and my comment --

6   and I know I made a comment to Bill that -- well, let me

7   set the scenario.

8                Mr. Yoder was -- as you know there was an

9   error made where we inadvertently overcharged for title

10  reports and we immediately -- when it was brought to our

11  attention we immediately said okay, let's fix it so we

12  notified the client.  We conducted an audit and when we

13  determined what the amount that was overcharged was and

14  owed to the client, we cut them a check for it and gave

15  it to them and we told them as much as we knew but for

16  some reason Mr. Yoder continued to like harangue us

17  about this.

18               There were several e-mail exchanges that I

19  was carbon copied on where, you know, he was threatening

20  a bar complaint and doing other stuff.  At the time Bill

21  was going through a death in the family and I just

22  thought the whole tone -- given that he was a

1    subordinate that his tone was disrespectful and

2    insubordinate and I opined to Bill.  I said I would fire

3    him just for being so insubordinate because I know he

4    wouldn't have talked to John Burson that way or Bill

5    Savage that way so why is he talking to us like this.

6         Q     Did you communicate that to Mr. O'Neil

7    through e-mail?

8         A     I think so, yeah.

9         Q     Have you produced that e-mail since you've

10   reviewed the e-mails that you've produced?

11        A     I don't know if I was asked to produce

12   e-mails between Mr. O'Neil and I.

13        Q     Concerning Mr. Yoder's termination?

14        A     Well, he wasn't terminated.  He quit.

15        Q     Concerning as you allegedly like to put it he

16   quit?

17        A     Right.

18        Q     What exactly was said to him that you know?

19              MR. O'NEIL:  I'm sorry, when?

20   BY MR. HOFFMAN:

21        Q     What was said to him, do you know?

22

1    or the last half of June?

2        A    The last half.

3        Q    And in terms of your workload then in

4    June 2014 can you describe that?

5        A    I don't really recall exactly what I was

6    doing.  I mean I'm sure I was busy.

7        Q    Was there any types of events that might have

8    caused you to be concerned about your own level of work,

9    personal level of work?

10       A    Sure.  I mean we always have to have new work

11   coming in but the difference between Mr. Yoder and I was

12   that I worked on tax lien work and I also did O'Neil

13   Group stuff.

14       Q    Were you working on tax lien work through

15   June 2014?

16       A    I think we were, yeah.

17       Q    Did there come a time when you stopped doing

18   tax lien work?

19       A    Yeah.

20       Q    When was that?

21       A    Maybe late 2015 at some point.

22       Q    Would those tax lien cases be reflected in

1    like the Maryland judiciary website, the case search?

2        A    Yeah.

3        Q    When you stopped doing -- first of all, the

4    tax lien work was only through one client; is that

5    correct?

6        A    Uh-huh, yes.

7        Q    Is that Woods Cove?

8        A    Yes.

9        Q    Did you lose any clients in 2014, the small

10   business clients?

11       A    I may have lost a few but clients come and

12   go.

13       Q    And from your own perspective, in the latter

14   half of 2014 and we're talking about July through

15   December, did you see that any foreclosure work was

16   going to pick up?

17            Did there come a time when foreclosure work

18   reappeared at least at the pace that would keep one

19   full-time attorney busy such as Mr. Yoder?

20       A    I think probably by I think late December of

21   2014 we thought that we were going to get a lot of

22   referrals in early 2015.

1       Q      And did that materialize?

2       A      Yeah.   I mean we did get a lot of referrals.

3   I don't know if we got the number of referrals that we

4   thought we would but --

5       Q      When you say "a lot of referrals" what are we

6   talking about?

7       A      Like 60 to 100 I think.

8       Q      And did you end up adding any attorneys after

9   Mr. Yoder separated?

10      A      Not really because Nida Hasan worked with us

11  when Mr. Yoder was there.  She continued working with us

12  albeit remote and she prepared a lot of the bankruptcy

13  pleadings and stuff, and then we had a guy named Kyle

14  Blackstone but Kyle helped out just on like post sale

15  stuff because he also did a lot of stuff directly for

16  BSI.

17      Q      Did Kyle work full-time?

18      A      Yeah.

19      Q      Was Kyle employed by MSO and/or The O'Neil

20  Group?

21      A      By The O'Neil Group.

22      Q      Did Kyle work on foreclosures?

```
 1        Q      Well, let's be specific.  Who?

 2        A      Sure.

 3        Q      Name names.

 4        A      Joe Martinez, Kristin Ferraro, Sallie

 5   Shanahan.

 6        Q      Anybody else?

 7        A      I think that's all the staff we had at the

 8   time.  I don't know what his relationship was like with

 9   Nida.  I think it was -- you know, he was like the boss

10   and told her what he wanted done.

11        Q      Any documents at all to support a poor

12   relationship with the staff, e-mails, texts, notes to

13   file?  Mr. Yoder has cursed at me another time.

14        A      No, he just -- you know, this is anecdotal.

15   I mean it's what they said to me after he left.  He was

16   condescending.  They didn't care for him and that

17   happens.

18        Q      Did you convey that to Mr. O'Neil?

19        A      Yeah, I think I probably did.

20        Q      When you say you "probably did" are you

21   certain you did?

22        A      No, I'm not certain I did.
```

1    documents and we could continue servicing the work that

2    we did have.

3         Q      Is it your testimony that you were the only

4    attorney that was assigned work?

5         A      No, it's not my testimony.

6         Q      So what is your testimony?

7                What attorneys handled work that Mr. Yoder

8    had in the pipeline so to speak?

9         A      Ms. Hasan worked on some of it.  I worked on

10   some of it.  Kyle Blackstone worked on some of it.  I

11   don't recall if Bill went to any sales so the day Yoder

12   quit, I asked him to give me a rundown on what sales he

13   had scheduled.  He gave me some information but then I

14   reached out to Harvey West because I knew that they were

15   the ones that scheduled the sales.

16        Q      Do you recall what day he left?

17        A      I believe it was June 30, 2014.

18        Q      Anything else from that day stick out in your

19   mind?

20        A      Yeah.

21        Q      All right.  What else?

22        A      So because I was really worried about making

```
1    it to say.  It wasn't me drafting a contract that they

2    would then hand to us for us to sign.

3         Q    Were you on vacation when Mr. Yoder had sent

4    this e-mail?

5         A    I might have been.  I might have been.  I

6    mean I would have to check but I know I came back -- I

7    don't know if I was on vacation then.  I know I came

8    back -- I mean I could consult the calendar.

9              Do you want me to -- you really want to know?

10        Q    Yeah, actually if you can consult your

11   calendar that's perfect.

12        A    I'm just going to go back and try to look at

13   2014 unless somebody has a calendar for then.  Okay,

14   2014 June 30 was a Monday and I came back from vacation

15   probably on that Saturday or Sunday before and these

16   were on that Wednesday.  I went to the West Coast so I

17   probably was gone -- I might have been gone ten days.  I

18   don't recall.  I don't recall exactly but I know that

19   the 30th was my first day back to work.

20        Q    Did you communicate with Mr. O'Neil while you

21   were on vacation?

22        A    Yes, I already told you that.
```

1        Q        Concerning Mr. Yoder?

2        A        Yeah, I said I found -- again, I don't know

3    if it's these e-mails or it was subsequent e-mails but I

4    said that I found his behavior -- his e-mails to be

5    insubordinate.

6              MR. HOFFMAN:  Now, let's have this marked as

7    Exhibit Number 7.

8              MR. O'NEIL:  Again, you don't have

9    consecutive Bates numbers here.  I think the first page

10   is unrelated to -- in fact, they were both produced by

11   different people.

12             MR. HOFFMAN:  It could be.  Let's just break

13   them into separate exhibits.  This will be seven.  No,

14   hold on a second.

15             MR. O'NEIL:  6989 should be seven I believe.

16             MR. HOFFMAN:  Okay, so this will be eight.

17             (T. Shanahan Deposition Exhibit 7 and Exhibit

18   8 were marked for identification and retained by

19   counsel.)

20   BY MR. HOFFMAN:

21        Q        Are you familiar with that document?

22        A        Sure.

```
1        Q      Is this one of the e-mails in which you take
2    exception to the tone?
3        A      Yeah.  I mean, you know, all of us are --
4    everybody on this e-mail is licensed to practice law and
5    so I understand that a given lawyer wants to ensure that
6    their reputation is squeaky clean without regard to what
7    their firm does and that they individually possess
8    ethical responsibilities but to me this is like well,
9    I'm going to supervise you, the guy that owns the firm
10   to make sure that you're doing things correctly, that
11   you've done a proper mea culpa with the client and I'm
12   guessing that that probably doesn't work in a lot of
13   places.  I'm guessing that my view would not be an
14   anomaly.
15       Q      Another question as soon as you're familiar
16   with the document.
17       A      Go ahead.
18       Q      You mentioned that MSO made amends with BSI
19   with respect to the overpayment on the titles.
20       A      Right.
21       Q      Do you know how much was repaid to BSI?
22       A      I believe it was either like 17 or $19,000.
```

1       Q      How can you not know what All Star was

2    charging in January 2014 or before given that it's a

3    huge part of this case?

4              How could you not know that today?

5       A      Well, you're asking because it's a huge part

6    of this case.  I mean --

7       Q      Did it ever dawn on you -- forget this case.

8    Forget the fact that it was ever filed.

9              Did it ever dawn on you when a repayment was

10   made to actually personally you go back and look at when

11   All Star was billing and at what rates in 2013 and early

12   2014?

13      A      Yeah, but I didn't do it personally.  I

14   caused an audit to be done.

15      Q      Let's also clarify one other part of your

16   testimony.

17             Is your testimony that in June of 2014 prior

18   to Mr. Yoder's separation from employment that MSO made

19   a payment to BSI for this overpayment and that Mr. Yoder

20   was still not satisfied with it?

21      A      I don't know -- truthfully I don't know when

22   the payment was made.  What I do know -- my recollection

1    at least is that he was still there when the audit was

2    done and we figured out how much it was going to be.  I

3    don't know when the check was cut exactly and I don't

4    know when they cashed it.

5         Q    Would you be surprised if I told you that

6    that's not correct, that the audit was conducted in July

7    of 2014, a month later?

8         A    I would be surprised but I mean I'm just

9    telling you what my recollection is.  I mean we

10   obviously knew about it.  How long it took to gather the

11   records I don't know.  I do know that as soon as he

12   disclosed it we said let's find out exactly what we're

13   talking about here.  I got to tell you that -- well,

14   never mind.  You got questions for me.

15        Q    I'm not cutting you off.

16             Did you have something to add?

17        A    I just want to stick to whatever you want to

18   get through today.

19             So are we still talking about this Hurley

20   Auctioneers thing?

21        Q    What's that?

22        A    Are we still on this?

1      A     No.

2      Q     The individual who was handling MSO billings

3   at that time was who?

4      A     I believe it was Sallie.

5      Q     And the response from Kristin Ferraro, can

6   you read that?

7      A     I can.  "I'm pretty sure that Sallie had

8   charged for title as soon as we ordered them from All

9   Star.  But yes, it is a mess."

10     Q     Would you agree that that characterization of

11  the invoicing was a mess is accurate?

12           MR. O'NEIL:  I'll object again.  It's an

13  incomplete document.

14           MR. HOFFMAN:  Okay.

15  BY MR. HOFFMAN:

16     Q     Would you agree with the characterization

17  that both Mr. O'Neil and Ms. Ferraro had at least on

18  June 23, 2014 that the invoicing was a mess?

19     A     Yeah.  I mean I think if Yoder had been

20  exercising more oversight it wouldn't have happened.

21     Q     It is your law firm, isn't it?  Yes or no?

22     A     Yeah, but as Mr. Yoder pointed out in an