

PLAINTIFF'S EXHIBIT 4

In the Matter Of:

# ERIK YODER

vs.

# THE O'NEIL GROUP, LLC, et al.

## SALLIE SHANAHAN

### January 19, 2017

DTI Court Reporting Solutions - Washington, DC
1-800-292-4789                www.deposition.com/washington-dc.htm

```
 1           IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3

 4   ERIK YODER,                    *

 5             Plaintiff,           *

 6        vs.                       *   Civil Action

 7   THE O'NEIL GROUP, LLC,         *   No. 8:16-CV-00900 DKC

 8   et al.,                        *

 9             Defendants.          *

10

11

12           Oral Deposition of SALLIE SHANAHAN

13                   Rockville, Maryland

14               Thursday, January 19, 2017

15                       9:56 a.m.

16

17

18

19   Job No.: WDC-111412

20   Pages 1 - 128

21   Reported by:  Vicki L. Forman

22
```

```
 1              Oral Deposition of SALLIE SHANAHAN, held at
 2    the offices of:
 3
 4         DTI Deposition Services
 5         21 Church Street, Suite 150
 6         Rockville, Maryland   20850
 7         (301) 762-8282
 8
 9
10
11              Pursuant to agreement, before Vicki L.
12    Forman, Court Reporter and Notary Public in and for the
13    State of Maryland.
14
15
16
17
18
19
20
21
22
```

```
 1              A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4       HOWARD B. HOFFMAN, ESQUIRE

 5       Law Office of Howard B. Hoffman

 6       600 Jefferson Plaza, Suite 304

 7       Rockville, Maryland  20852

 8       (301) 251-3752

 9

10

11

12    ON BEHALF OF THE DEFENDANTS:

13       WILLIAM T. O'NEIL, ESQUIRE

14       The O'Neil Group, LLC

15       Suite 1375

16       7500 Old Georgetown Road

17       Bethesda, Maryland  20814

18       (202) 684-7140

19

20

21

22
```

```
 1                      C O N T E N T S

 2    EXAMINATION OF SALLIE SHANAHAN                              PAGE

 3         By Mr. Hoffman                                           5

 4

 5

 6

 7                         E X H I B I T S

 8                      (Retained by Counsel)

 9    SHANAHAN DEPOSITION EXHIBIT                                 PAGE

10       Exhibit 1    2/15/14 E-mail, TOL006828                    61

11       Exhibit 2    11/14/13 E-mail, TOL007451                   65

12       Exhibit 3    6/23/14 E-mail String, TOL007132             68

13       Exhibit 4    6/11/14 E-mail, TOL008011                    85

14       Exhibit 5    3/25/14 E-mail, TOL007106                   118

15       Exhibit 6    9/27/13-9/28/13 E-mail, TOL007386           120

16       Exhibit 7    4/9/14-4/11/14 E-mail, TOL007109            122

17

18

19

20

21

22
```

```
 1      A     I mean they're not pals.
 2      Q     I'm sorry, that's not the question.
 3            Do you know if they still stay in touch?
 4      A     You know, I don't check up on who he's talked
 5   to.  I don't keep a tally of that.
 6      Q     So what was your role for MSO when it first
 7   began?
 8      A     I was a processor.
 9      Q     And what does a processor do?
10      A     A processor helps produce the documents that
11   are needed in a foreclosure.  Yeah, in a foreclosure or
12   bankruptcy, whatever.  They work -- yeah.
13      Q     I'm sorry?
14      A     They just help produce the documents.
15      Q     Was there like a set of forms that you were
16   using?
17      A     Well, there are forms in a foreclosure but
18   there's, you know, all kinds of different documents that
19   are needed.
20      Q     What kind of documents would be needed if you
21   were going to foreclose on a home in Maryland?
22      A     An assignment of mortgage, substitution of
```

```
 1   we used their formalized training manuals and their
 2   system.
 3       Q    I want to begin to now focus on what training
 4   you received prior to Mr. Yoder beginning with MSO.
 5       A    Okay.
 6       Q    How many seminars or conferences did you
 7   attend prior to Mr. Yoder beginning his employment?
 8       A    None.  I mean I had been -- I had received
 9   instruction but I hadn't -- we were a brand-new firm.  I
10   was, you know, brand-new.  We hadn't had a chance to do
11   that yet.
12       Q    And you said you received instructions.
13            That would have been from the attorneys in
14   the office?
15       A    Uh-huh.
16       Q    Did you receive instructions from BSI?
17       A    Yes.
18       Q    And who at BSI would you have received
19   instructions from?
20       A    Again Bethany, Dan.  Dan was in Bethany's
21   office, yeah.  Again, not a lot but he would tell me how
22   to do things but I don't think that was with MSO.  I
```

```
 1    foreclosure that you would perform?
 2        A    We would create documents.  We would mail
 3    documents.  We would communicate with the outside --
 4    with BSI.  We would respond.  I'm sure you're asking
 5    about invoicing.  I would create an invoice for our
 6    clients.
 7        Q    You're referring to an invoice to BSI?
 8        A    Yes.
 9        Q    And you would prepare that?
10        A    Yes.
11        Q    The only invoices that you would prepare
12    would be to BSI?
13        A    Yes.  Well, yeah.  Now, there might be an
14    outlier that I'm not thinking of but yes, that was my
15    job, do what it takes to process the foreclosure so
16    that's part -- you know, you got to get paid so that's
17    part of it.
18        Q    Did MSO invoice every 30 days?
19        A    We invoiced when we did something.  At the
20    beginning we invoiced when something occurred.
21        Q    Like an event?
22        A    Yes, when something occurred.  BSI had
```

1  be wrong so it was months.  It was a very short time.

2      Q     And you don't recall the period of time

3  between his separation and Mr. Yoder beginning?

4      A     Very short.  Very short.

5      Q     And was Mr. Yoder hired to replace Kurt?

6      A     He was hired to be the expert on foreclosure

7  processing in the state of Maryland and to be the

8  attorney that was going to be in charge of it and was

9  going to be the attorney that trained me.  That was his

10 job.

11     Q     Did you meet with Erik prior to his hiring?

12     A     Nope, I was told that this is the guy that

13 you're going to work with.

14     Q     Now, were there any other responsibilities

15 that you had that we're leaving out other than what

16 you've described?

17     A     You might be hinting at something but I --

18     Q     I'm not hinting.  It's not a trick question.

19     A     Okay, I really don't think that I've missed

20 something but -- I don't think I've missed something.

21     Q     Okay.  If you have in fact missed something

22 it would be a small amount of your overall