PLAINTIFF'S EXHIBIT 20

# THE O'NEIL GROUP LLC

Washington, DC
1629 K Street NW, Suite 300
Washington, DC 20006

Bethesda, MD
7500 Old Georgetown Road, Suite 1375
Bethesda, MD 20814

William T. O'Neil
woneil@oneilgroupllc.com
202-684-7140
(m) 202-445-4277
(f) 202-517-9179

August 6, 2014

By Federal Express

Amy S. Paulick, Esq.
Assistant Bar Counsel
Attorney Grievance Commission of Maryland
100 Community Place
Suite 3301
Crownsville, MD 21032-2027

**RECEIVED**
AUG 0 7 2014
Attorney Grievance Commission

Re:  File No. 2014-1415
     Complainant: Erik W. Yoder

Dear Ms. Paulick:

I write in response to your letter of July 22, 2014, enclosing the "Report of Professional Misconduct" submitted to the Attorney Grievance Commission of Maryland, dated July 9, 2014, by our former employee Erik Yoder. As detailed below, we have reviewed Mr. Yoder's allegations in detail and consulted with both our clients and outside counsel regarding these matters, and we have concluded that in addition to being factually inaccurate, misleading and incomplete, the allegations, even if credited, are not disciplinary in nature, and for this reason alone should not become a docketed complaint. We will address each of Mr. Yoder allegations in turn, after providing some necessary background on the firm and the clients at the center of Mr. Yoder's complaints.

**Firm Background**

The O'Neil Group, LLC was founded by myself in 2011. I was first admitted to the District of Columbia bar in 1990, after graduating from Duke University School of Law. I worked as a litigator on complex litigation matters, primarily with respect to breach of contracts, for six years at Covington & Burling in Washington, D.C. In 1996, I moved to Swidler & Berlin, then a mid-sized firm located in Washington, D.C., and continued to litigate large

Ms. Amy S. Paulick, Esq.
Assistant Bar Counsel
August 6, 2014
Page 2

commercial contract matters. I was named "Of Counsel" at Swidler Berlin in approximately 1999.

In 2004, I became a member of the Maryland Bar by passing the practicing attorney exam. In 2006, I co-founded the firm Burke O'Neil LLC, and practiced there for four years, doing contract actions, government investigations, False Claims Act litigation and plaintiffs-side work in the areas of personal injury, mass tort and class actions. In one case there, we represented the Government of the Dominican Republic in a groundbreaking case filed in the eastern District of Virginia. In 2010, I took a position working for the Department of Defense as Department Counsel.

In 2011, I was approached by members of MCM Capital who I have known for many years, including as Mr. Yoder noted my brother-in-law, who requested that I serve as general counsel for litigation, overseeing relationships with a network of outside counsel across the nation handling foreclosure actions, bankruptcy work and related matters with respect to a large portfolio of non-performing loans owned by MCM. Eventually MCM and I agreed that I would take on that work from my own firm, and in September of 2011, The O'Neil Group, LLC was formed. Terrance Shanahan, who I had worked with previously, was also hired as a partner in the firm at that time. Mr. Shanahan has over 10 years of experience in private practice, with extensive experience in litigation, bankruptcy, securities, and corporate law, as well as more direct experience in creditor rights and real estate.[1] Since 2011, I and Mr. Shanahan have had a direct role in approximately 7500 real estate and foreclosure files on behalf of MCM, which included oversight in courts across the country, review of pleadings, approval of fees and costs, direct settlement negotiations and all other aspects of contract review and approval, including real estate closings, financing agreements, deeds-in lieu of foreclosure, listing agreements and other legal mechanisms for resolving outstanding debt.

In late 2012, MCM again approached us to handle directly those non-performing loan assets in Maryland, including foreclosure work that we had been overseeing since 2011. To handle these cases, we created a new entity, MSO Legal Partners LLC ("MSO"), and added more direct foreclosure experience by hiring as partner Kurt Mueller, a professional and person acquaintance of Mr. Shanahan. In addition, MSO made a sizable investment in the case management software "CaseAware," which is an industry leader in the foreclosure marketplace and was highly recommended by multiple law firms that we have worked with in this area for the past several years.

At first, MSO handled only a few files, and in fact did not have any billings for foreclosure work in 2012. By 2013, however, we were receiving additional referrals from MCM and its servicer partner BSI Financial Services, Inc. ("BSI"), to handle foreclosures in Maryland. For the first half of 2013, all three partners in MSO had a direct role in the files, including review

---

[1] In addition, Mr. Shanahan had a distinguished 20 year career in the United States Navy, during which he completed law school at the University of Maryland.

2

Ms. Amy S. Paulick, Esq.
Assistant Bar Counsel
August 6, 2014
Page 3

of title reports prepared by an outside vendor (in most cases All Star Title), pleadings and borrower responses. Mr. Shanahan and I also enrolled in continuing legal education classes addressing Maryland title issues and real estate matters generally. In addition to the three lawyers directly overseeing the foreclosure work, The O'Neil Group and MSO hired two additional attorneys, one part time and one full time, to be available to handle issues in the MSO caseload as they arose. In addition, MSO had access to three administrative staff to assist with work flow, billings and file processing. In the summer of 2013, Mr. Mueller decided to focus his energies into other work, and therefore the firm began looking for additional help, as the increasing work required additional staff. We hired Mr. Yoder in September 2013, based on representations made that he had experience in all areas of foreclosure work in Maryland and that he had experience utilizing CaseAware as a case management tool. It was also required that Mr. Yoder be familiar with a tool called "Lenstar" through which BSI as the loan servicer and MSO would communicate and track work flow. To date, neither BSI nor MCM have expressed to us that they consider MSO's handling of foreclosure files as inadequate, incompetent, or failing to meet their standards or industry standards generally. See the Affidavit of Justin Wenk, at ¶ 1, attached as Exhibit 1.

Throughout our professional careers, neither I nor Mr. Shanahan has been accused of any professional impropriety or violations of the rules of ethics. The remainder of this response will address the specific alleged violations of the Maryland Rules of Professional Conduct.

### Misreporting and Overbilling of Costs

In June of 2014, Mr. Yoder brought to my attention an error in billing, wherein MSO had billed the costs of obtaining title reports at $350, and unbeknownst to those preparing the bills, All Star had only charged $250 or less per report. This error in billing was simply that, an error, and not a scheme to defraud our client or borrowers. A miscommunication or failure in communication with those preparing the bills resulted in the error, which has been fixed and a full refund paid to the client. See Exhibit 1 at ¶ 2. If in the future we uncover other errors, we will fix those as well.

Contrary to Mr. Yoder's allegations, there was no scheme to raise revenue by overbilling title report costs, only confusion arising from a new process. The conversations that he misinterprets and twists reveal no such "scheme," only confusion over the billing process. It has always been firm policy that MSO bills the loan servicer BSI according to an agreed fee schedule, and all costs are simply submitted to BSI for payment as pass-throughs. Thus, when a new file was referred to MSO by BSI, MSO would order a title report from All Star Title, pursuant to an arrangement that BSI had established with All Star Title. All Star is also a vendor handling REO property closings, and has a close working relationship with BSI that predates the formation of MSO. MSO has no links, direct or indirect, with All Star. All Star would send their report to MSO, and also invoice MSO for payment of the negotiated fee. These invoices came to Mr. Yoder, among others. We later discovered that, without any authorization from the firm or the client to alter any contract with a vendor, Mr. Yoder undertook to revise the

3

Ms. Amy S. Paulick, Esq.
Assistant Bar Counsel
August 6, 2014
Page 4

agreement that MSO previously had with All Star Title, without informing the partners or the client.[2]

Because The O'Neil Group had overseen many foreclosure files and many fee requests handled by other law firms in Maryland, we were aware of the costs other firms presented for title reports, as well as the allowable costs paid by BSI. Several firms in Maryland and elsewhere would bill $350 or more for title report costs, and this was an allowed amount in Maryland. Mr. Yoder was the attorney in charge of instructing staff to prepare invoices, and Mr. Yoder was the attorney receiving and reviewing invoices from the vendors. Mr. Yoder failed to communicate the actual costs of vendor services to the rest of the firm, or failed to review the bills against invoices in hand. The support staff believed they were correctly invoicing the client. MSO staff, believing that they were billing the standard rate, presented such sums on invoices to BSI, and BSI paid those amounts as consistent with their allowances.

Mr. Yoder first raised an issue with a potential billing problem on the title reports in an email on June 12, 2014. A response agreeing with Mr. Yoder that the costs should have been billed as incurred and not "marked-up" was sent that evening. The next day, the firm initiated a review of all of the billing to determine how many files had been billed in error. I personally had discussions with BSI management to inform them of the billing error and told them of our ongoing investigation and intent to refund all overpayments. By July 9, 2014, a review had been completed, revised invoices prepared and a meeting was held with the BSI branch manager to explain the errors. That same day, BSI was presented with a check for $17,225 refunding for all overcharged costs on 106 different files. See Exhibit 1 at ¶ 2.[3] Our understanding is that BSI is crediting each account accordingly and we will confirm that is done correctly.

**Competence and Diligence**

Mr. Yoder seems to suggest that because several of the over 150 files we have handled for BSI over the past 18 months encountered problems, that the partners at MSO lack the competence and diligence to ethically handle this work. Mr. Yoder's complaint lacks any substance.[4] The attorneys at MSO have over 40 years of experience in a variety of fields, including complex litigation, real estate, finance and many other fields. Prior to taking on directly the foreclosure work in Maryland, MSO attorneys oversaw such work, including pleadings and billings, for over a year. We worked with and consulted with some of the largest foreclosure firms in Maryland, but offered our clients a more attorney driven and responsive

---

[2] Mr. Yoder requested that All Star not only deliver the title documents, but provide a legal interpretation of the results as well. This step seems inconsistent with Mr. Yoder claiming to be the only lawyer at MSO who could read a title report.

[3] The review also discovered that several files had underbilled for various costs, and that Mr. Yoder had been receiving cost invoices for some time that were neither properly accounted for, billed to the client or paid to vendors. This too has been rectified since Mr. Yoder's departure from the firm.

[4] The one specific file he identifies, the "Windon" file, did have a problem that arose from a vendor that reported to us that service of required documents on the borrower was executed, which we later discovered was inaccurate. This error required that we postpone the foreclosure sale of the property and re-serve the borrower, which we did.

4

Ms. Amy S. Paulick, Esq.
Assistant Bar Counsel
August 6, 2014
Page 5

alternative, built on the close working relationship between The O'Neil Group and BSI over the past three years. Prior to Mr. Yoder's quitting his job, we had hired another attorney who has run his own title company in Maryland and has several years of experience in commercial and residential foreclosures. In short, we have the experience and the expertise necessary to provide more than adequate representation to our clients, clients who have not expressed dissatisfaction with our performance.

### The Unauthorized Practice of Law

The O'Neil Group and MSO have never allowed any personnel to practice law or take any actions that have been or would be incompatible with the professional obligations of the lawyer, nor are we aware of any conduct by non-lawyers at the firm that would be a violation of the Maryland Lawyers' Rules of Professional Conduct. See M.R.P.C. Rule 5.3. Simply stated, the administrative staff at The O'Neil Group and MSO perform administrative functions, have never filed anything with any Court, and all filings by The O'Neil Group and MSO are filed by counsel, who review and authorize such work, in consultation with our clients.

Mr. Yoder questions the competency of the administrative staff. Both Ms. Shanahan and Ms. Ferraro have bachelor's degrees and varied experience, including working at other law firms and financial services companies that certainly qualify them for the work they are doing for MSO. Any animosity between Mr. Yoder and the support staff arose due to Mr. Yoder's abrasive personality and his persistent refusal to work with CaseAware, which the administrative staff and other lawyers in the firm were dedicating substantial efforts to make functional. Mr. Yoder constantly worked outside of CaseAware, despite contrary instructions, jeopardizing the firm's substantial investment in that product. Mr. Yoder also did not work within Lenstar to update files and note progress, and in the weeks since he quit we have had to devote substantial time to fixing these errors. Contrary to Mr. Yoder's claims, Ms. Shanahan did not act without oversight, instead she processed documents for either servicer or lawyer review.

It is absolutely false that Mr. Shanahan filed pleadings in court without reviewing them. All of the papers identified by Mr. Yoder were reviewed both by counsel, Mr. Shanahan, and a Vice President of servicer BSI.

### Conflicts of Interest

Mr. Yoder's effort to create a "conflict of interest" misses the mark. There is no relationship between Hurley Auctioneers ("Hurley") and MSO or The O'Neil Group. MSO sent Hurley a proposed contact for Hurley's services, and that contract was negotiated consistent with any law firm/vendor negotiation. Hurley was never a client of either MSO or The O'Neil Group at any time, such that a conflict could have arisen between Hurley and BSI.[5]

---

[5] In our discussion with Hurley regarding retaining them for auctions, Mr. Shanahan told Matt Hurley that he would send him a contract, which included terms that MSO had negotiated. MSO requested his proposed changes. Mr. Shanahan forwarded that draft agreement to Mr. Yoder for his input, and then agreed to the terms. To be clear, Mr.

5

Ms. Amy S. Paulick, Esq.
Assistant Bar Counsel
August 6, 2014
Page 6

Prior to Mr. Yoder's arrival, MSO utilized several different auction firms as vendors in Maryland foreclosure actions. The local counsel we oversaw also used numerous auctioneers. Mr. Yoder requested that MSO use Harvey West Auctioneers as exclusive auctioneer for MSO. At one point Mr. Shanahan proposed trying Hurley Auctions, and met with Matt Hurley about doing some work for MSO. Mr. Shanahan did not attempt to help a family "expand his auction company into Maryland." In fact, Hurley Auctions has been doing business in Maryland for some time. MSO wanted to find an auctioneer proximate to western Maryland counties because Harvey West Auctioneers is located in Baltimore County. Mr. Shanahan drafted an agreement with Hurley Auctions which comported with previous agreements made by MSO with auctioneers. One sale was scheduled with Hurley Auctions, but Harvey West Auctioneers did all the service and publication work. Ultimately, MSO decided to have Harvey West Auctioneers actually do the property sale, which Mr. Shanahan attended. While we are pleased with Harvey West Auctioneers, it is not unusual to use more than one vendor for services. The agreement with Hurley Auctions included higher auctioneer fees, but that is only a portion of the fees charged per file. MSO was concerned with both the overall costs and the convenience of performing auctions far from Baltimore County. MSO has never been invoiced by nor paid Hurley for any services, and thus the client has not paid for any services from Hurley Auctions. Hurley ultimately cannot (at this juncture) provide all the services Harvey West can and so MSO has not used them. We may reconsider that decision in the future.[6] If that occurs, the client BSI will be fully informed and the costs and fees must meet BSI guidelines, or they will not be paid. Our exploring an option with Hurley did not create a conflict of interest between MSO and BSI, or any other entities.

### Mr. Yoder's Departure from The O'Neil Group and MSO

In June of this year, one of MSO's largest clients informed us that they would be taking their foreclosure work in-house. In addition, we learned that BSI would not be providing new referrals for the foreseeable future due to market conditions. These two occurrences made the finances at MSO untenable. For this reason, I informed Mr. Yoder on Friday, June 25, 2014, that he should start looking for employment elsewhere. An additional factor was Mr. Yoder's caustic nature within the office that had every employee at the firm complaining to me about continuing to work with him. I told him that looking for a job was a full time effort in the current market

---

Shanahan, as a partner at MSO, was negotiating with a vendor with which MSO would have contractual privity. It is true that the costs would pass on to the client, but as noted above cost is only one consideration of the vendor relationship. There was no attorney-client relationship between MSO and Hurley. There was no action between MSO and Hurley that compromised MSO's attorney-client relationship with BSI. There was no conflict to disclose and no consent needed.

[6] Upon Mr. Yoder's abrupt departure, Mr. Shanahan called Harvey West to let them know that he was no longer with the firm and to determine the point of contact going forward. Ron West, the owner of Harvey West, then informed us that they had sent over $20,000 in invoices to Mr. Yoder that had gone unpaid, many for several months, dating back to April 2014. Mr. Shanahan asked that the invoices be resent whereupon MSO paid the invoices as quickly as possible. Despite this problem, Harvey West continues to be our main vendor for auction services.

Ms. Amy S. Paulick, Esq.
Assistant Bar Counsel
August 6, 2014
Page 7

and that if he preferred, the firm would pay him through the end of July whether he came to work or not, assuming he cooperated on the transition.

Mr. Yoder immediately characterized the discussion as a firing, and I told him that it was not, and that he should consider what he wants to do over the weekend and we would talk on Monday. On Monday, June 30, Mr. Shanahan asked Mr. Yoder in Mr. Yoder's office what his intentions were regarding working in July. He was simply trying to ascertain what items he had on his calendar that we would need to cover and where he was in the process with our foreclosure files. Again Mr. Yoder attempted to mischaracterize this as a firing, and left the office, not to return. Despite Mr. Yoder's abrupt walking out, MSO met all of its obligations to Mr. Yoder. Part of our agreement was that Mr. Yoder would receive 10% of the **revenue** from foreclosure work for which MSO was paid, in addition to his salary. MSO paid him on July 15 for revenue received in June.

We wish Mr. Yoder well, but the fact remains that Mr. Yoder ignored the partners' direction to use CaseAware and had firm employees create a spreadsheet to track foreclosures. He failed routinely to update the LenStar system to keep the client apprised of progress on cases. Whenever asked about a problem or an issue, Mr. Yoder became defensive and dismissive. He was condescending to support staff. The foreclosure files he maintained were in disarray, despite the fact that he had all the resources he asked for to assist him. It was obvious to all that Mr. Yoder was unhappy in his work. He complained about his salary, his office, his co-workers, and his opportunities for advancement, all within six months of joining a very collegial firm. But that unhappiness is not evidence of behavior in violation of the Maryland Rules of Professional Conduct by any of the Partners or employees of the O'Neil Group and MSO.

Please let us know if we can be of any further assistance.

Sincerely,

William T. O'Neil
Principal
The O'Neil Group, LLC

Re: File No. 2014-1415

## AFFIDAVIT OF JUSTIN WENK

I, Justin Wenk, under the penalty of perjury, state as follows:

1. I am the Branch Manager and Vice President of BSI Financial Services, Inc. ("BSI") I have been in the loan servicing business for 18 years and have worked with hundreds of law firms over my career handling foreclosures and related legal services. Our firm retained MSO Legal Partners, LLC ("MSO") to handle foreclosures in Maryland for loans serviced by our branch. We have been satisfied with MSO's services, and believe they are comparable to other larger firms handling foreclosures in Maryland.

2. On July 9, 2014, William O'Neil delivered to me a check for $17,225.00 as a refund of improperly billed title report costs, along with an Excel spreadsheet listing each loan and the amount of the overbilling. BSI has credited each borrower's account with the proper refund. Mr. O'Neil had told me about the problem with the billing several weeks prior to issuing the refund.

Further the Affiant Sayeth Not.

_____
Justin Wenk

YODER Prod. 000075
1/7