IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIK YODER                          :

                                    :

    v.                              :    Civil Action No. DKC 16-0900

                                    :

THE O'NEIL GROUP, LLC, et al.       :

                                    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this whistleblower retaliation case are a motion for summary judgment filed by Defendants The O'Neil Group, LLC, MSO Legal Partners, LLC, and William O'Neil (collectively, "Defendants") and a motion for leave to file a surreply filed by Plaintiff Erik Yoder ("Plaintiff"). (ECF Nos. 33; 38). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motions will be denied.

## I. Background

### A. Factual Background[1]

The O'Neil Group, LLC ("TOG") was formed in 2011 to perform foreclosure work for MCM Capital Partners, LLC ("MCM"), and its related mortgage loan servicer BSI Financial ("BSI"). (ECF Nos. 33-2 ¶ 1; 36-2, at 8, 10). TOG created a national network of

---

[1] Unless otherwise noted, the facts outlined here are undisputed and construed in the light most favorable to Plaintiff.

law firms to handle the legal work arising from MCM's purchase of non-performing mortgage debts on behalf of third-party investors. (ECF No. 33-2 ¶ 1). TOG hired the law firms, oversaw their work, and reviewed and approved invoices for the work that were then submitted to the loan servicer BSI. (*Id.*). The standards for approval or rejection of invoices were provided by BSI to be implemented by Defendants. (*Id.* ¶ 2). BSI policy was that costs were to be billed as incurred and not marked up. (*Id.* ¶ 6). In addition, BSI policy limited the payment for title work to $350 for a full report and $175 for a title update – known as the "allowable amount." (ECF Nos. 33-2 ¶¶ 2, 6; 33-5 ¶ 1; 36-7 ¶ 9). After BSI paid TOG, TOG paid the law firms. (ECF No. 33-2 ¶ 1).

In late 2013, Defendant O'Neil and Terry Shanahan formed a new entity, MSO Legal Partners, LLC ("MSO"), to handle foreclosure referrals in Maryland from BSI. (ECF Nos. 33-2 ¶ 3; 36-2, at 20, 25). In order to keep costs down, MSO used TOG personnel for its staff. (ECF No. 33-2 ¶ 3). In September 2013, Defendants hired Plaintiff, an experienced foreclosure attorney, to run the foreclosure practice at MSO. (ECF Nos. 33-2 ¶¶ 4, 5; 36-2, at 24; 36-3, at 27-29; 36-5, at 9). While conducting an audit in early June 2014 to be filed in a mortgage foreclosure case (the "Windon case"), Plaintiff asked Defendants' administrative personnel to provide him with the

relevant title report and title update invoices. (ECF No. 36-7
¶¶ 10, 12). Instead of providing the invoices as requested,
Sally Shanahan, an administrative employee and Mr. Shanahan's
wife, informed Plaintiff that Defendants billed the full
allowable amounts of $350 per title report and $175 per title
update. (*Id.* ¶ 12). Kristin Ferraro, another administrative
employee, confirmed that information. (*Id.*). In order to
obtain the actual costs for title reports and updates in the
Windon case, Plaintiff contacted All Star Title, the company
that performed title reports and title updates in Defendants'
foreclosure cases. Plaintiff was informed that All Star Title
billed $150 per title report until April 2014 when the price
increased to $250 per title report. All Star Title billed $15
per title update. (*Id.*). With that information, Plaintiff
realized that Defendants had been billing BSI more than double
the actual cost for title reports and over 11 times the actual
cost for title updates. (*Id.*). Mrs. Shanahan later informed
Plaintiff that Defendants billed BSI for title work before
Defendants received any invoices from All Star, that BSI took 30
days to process and pay bills after receipt, and that Defendants
needed payments more quickly in order to pay their own expenses.
(*Id.* ¶ 14).

On June 12, 2014, Plaintiff sent an email to Mr. O'Neil
notifying him of the overbilling of costs and expressing his

belief that the practice was unlawful. (ECF Nos. 33-2 ¶ 12; 36-7 ¶ 13; 36-9). That evening, Mr. O'Neil responded stating that he was out of the office until the following week but that "there should not be any mark up of costs . . . . So let's take a look at this to make sure it's right." (ECF No. 36-10). Plaintiff and Mr. O'Neil had a meeting on June 17 to discuss the billing error. (ECF No. 36-2, at 32). Mr. O'Neil confirmed that Defendants "were supposed to bill the actual amount charged," as it had "always been the firm policy," and that "[Defendants] would have to refund the money [to BSI]." (*Id.*). Mr. O'Neil told Plaintiff that an investigation would be done to "figure out how much the refund was supposed to be," and that, in regard to the process of creating invoices, "[Defendants] had to change and/or implement a process since [Defendants] didn't appear to have one." (ECF Nos. 33-2 at 3, 24; 36-2, at 33). That same day, Plaintiff sent an e-mail to Mr. O'Neil to ensure that "within the next two weeks" BSI would be informed that invoices for title work were submitted to them that did not reflect actual costs, that BSI would be offered a refund, and that BSI would agree to "remediate this billing error . . . by correcting or reconciling any and all of the borrower's accounting of debt . . . so that none of the borrowers are charged costs which were not actual." (ECF No. 36-13).

On June 18, Plaintiff sent an email to Mr. O'Neil regarding a proposal by Mr. Shanahan to switch auctioneers from their established vendor to an inexperienced vendor. (ECF No. 36-14). Plaintiff disagreed with the proposal and stated that if Defendants were going to switch to an auctioneer that charged higher costs and had less experience that it was appropriate "within the rules of ethics" to obtain the consent of their client BSI. (*Id.*). Mr. O'Neil became irate and requested that Plaintiff "please refrain from the ethics lectures." (ECF No. 36-15, at 2). Mr. Shanahan found Plaintiff's statements "accusatory" and they "caused [him] considerable concern such that [he] recommended to Mr. O'Neil that Plaintiff should be asked to resign." (ECF Nos. 33-2 ¶ 21; 33-3 ¶ 8).

On June 27, Mr. O'Neil informed Plaintiff that he was not firing him but that, due to the "financial condition of the firm," Defendants would not be able to continue paying Plaintiff what they had been and that "[Plaintiff] would be better off looking for another job." (ECF Nos. 33-2 ¶ 22; 36-2, at 39). Mr. O'Neil told Plaintiff that he would not have to work while he was looking for a job, and Defendants offered to pay Plaintiff's salary, commission, and benefits through the end of July. (ECF Nos. 33-2 ¶ 22; 36-7 ¶ 19). Plaintiff was shocked by this news and walked out of the office. (ECF Nos. 33-2 ¶ 24; 36-7 ¶ 19). Plaintiff did not tell Mr. O'Neil that he was

quitting his job. (ECF No. 36-7 ¶ 20). Subsequently, Plaintiff and Mr. O'Neil arranged to meet on June 30 at the office. (ECF No. 36-7 ¶ 21). However, Mr. Shanahan, rather than Mr. O'Neil, was present at the meeting and informed Plaintiff that there was no need for him to come into the office but that he could use the office until the end of July. (ECF Nos. 36-7 ¶ 21; 36-19). Plaintiff subsequently e-mailed Mr. O'Neil regarding the meeting with Mr. Shanahan. (ECF Nos. 33-2, at 11; 36-19, at 2). Mr. O'Neil replied, attaching a resignation letter and stating, "you will need to sign the attached. If you do not want to resign, then I will accommodate your insistence that you be fired. Let me know which of those two options you prefer." (ECF Nos. 33-2, at 9-10; 36-18; 36-19). Plaintiff refused to sign the resignation letter. (ECF No. 36-7 ¶ 21). Upon that action, Defendants concluded that Plaintiff had quit and that his last day of employment would be considered June 30, 2014. Plaintiff was paid his salary and commission up until June 30. (ECF No. 33-2 ¶ 26).

   **B.  Procedural Background**

   On March 25, 2016, Plaintiff filed a complaint against Defendants alleging unlawful termination of his employment in violation of the employee protection (whistleblower) provision of the Consumer Financial Protection Act of 2010, Section 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act

(the "CFPA"), 12 U.S.C. § 5567.  (ECF No. 1).  Defendants moved
for summary judgment on May 16, 2017.  (ECF No. 33).  Plaintiff
submitted an opposition on June 19 (ECF No. 36), and Defendants
replied (ECF No. 37).  On July 17, Plaintiff filed the pending
motion for leave to file a surreply.  (ECF No. 38).

## II.  Motion for Leave to File Surreply

Unless otherwise ordered by the court, surreply memoranda
are not permitted to be filed.  Local Rule 105.2(a).  Surreplies
may be permitted when the moving party would be unable to
contest matters presented to the court for the first time in the
opposing party's reply.  *Lewis v. Rumsfeld*, 154 F.Supp.2d 56, 61
(D.D.C. 2001).

In his motion for leave to file a surreply, Plaintiff
contends that Defendants argue for the first time in their reply
that they held a subjective belief that their business faced
considerable financial and personnel issues and that their
reasons for asking Plaintiff to look for another job should be
judged by what Defendants believed at the time to be true.  (ECF
No. 38 ¶¶ 2-3).  Plaintiff also argues that Defendants assert
for the first time in their reply that they never focused on the
economic impact of losing their client Woods Cove, but instead
on the fact that losing that client freed up Mr. Shanahan's time
and Plaintiff's services were no longer needed.  (*Id.* ¶¶ 4-5).
Defendants did not raise any new issues or legal theories in

their reply brief and merely responded to arguments in Plaintiff's opposition that "Defendants did not honestly believe that their business was in decline" when Plaintiff was asked to look for another job (ECF No. 36, at 33), and that "Defendants cannot credibly maintain that Woods Cove had anything to do with the . . . decision [to] terminate [Plaintiff]" (ECF No. 36, at 41). Therefore, Plaintiff's motion for leave to file a surreply is denied.

## III. Motion for Summary Judgment

### A. Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact. *Liberty Lobby*, 477 U.S. at 248-50. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 249. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the

party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

**B. Analysis**

The CFPA established the Bureau of Consumer Financial Protection (the "Bureau") to promulgate regulations to enforce "enumerated consumer laws". *Calderone v. Sonic Houston JLR, LP*, 2016 WL 6037239, at *3 (S.D. Tex. Oct. 14, 2016). "The laws subject to the Bureau's jurisdiction . . . include, among others, . . . the Fair Debt Collection Practices Act (15 U.S.C. § 1692, *et seq.*)[(the "FDCPA")]." Procedures for Handling Retaliation Complaints Under the Employee Protection Provision of the CFPA, 81 Fed. Reg. 14374, 14375 (Mar. 17, 2016). The relevant provision of the CFPA under which this retaliation claim was brought provides as follows:

> No covered person or service provider shall terminate or . . . cause to be terminated . . . any covered employee . . . by reason of the fact that such employee . . . . [has] provided, caused to be provided, or is about to provide or cause to be provided, information to the employer, the Bureau, or any other State, local, or Federal,

9

> government authority or law
> enforcement agency relating to any violation of, or any
> act or omission that the employee reasonably
> believes to be a violation of, any provision
> of this title or any other provision of law
> that is subject to the jurisdiction of the
> Bureau, or any rule, order, standard, or
> prohibition prescribed by the Bureau[.]

12 U.S.C. § 5567(a)(1). In order to establish a prima facie
case of retaliation under the CFPA, a plaintiff has the burden
of "showing that any behavior described in paragraphs (1)
through (4) of subsection (a) was a contributing factor in the
unfavorable personnel action alleged in the complaint." §
5567(c)(3)(A)). The plaintiff must establish a prima facie case
of retaliation by proving, by a preponderance of the evidence,
that "(1) he engaged in protected activity; (2) the employer
knew or suspected, either actually or constructively, that he
engaged in the protected activity; (3) he suffered an
unfavorable personnel or employment action; and (4) the
protected activity was a contributing factor in the unfavorable
action." *Rhinehimer v. U.S. Bancorp Investments, Inc.*, 787 F.3d
797, 805 (6th Cir. 2015); *see also Feldman v. Law Enf't Assocs.
Corp.*, 752 F.3d 339, 344 (4th Cir. 2014) (setting out the
requirements for a retaliation claim under the Sarbanes-Oxley
Act whistleblower provision, 18 U.S.C. § 1514A). If the
plaintiff makes out a successful prima facie case, the employer
must demonstrate, "by clear and convincing evidence, that the

employer would have taken the same unfavorable personnel action in the absence of that behavior." 12 U.S.C. § 5567(c)(3)(B).

Defendants argue that they are entitled to judgment in their favor on Plaintiff's retaliation claim because Plaintiff cannot prove by a preponderance of the evidence that (1) he engaged in protected activity; (2) he suffered an unfavorable personnel action; and (3) that the protected activity was a contributing factor in the unfavorable action. (ECF No. 33-1, at 5-6).

### 1. Protected Activity

The FDCPA protects an employee who complains to an employer about "any act or omission that the employee reasonably believes to be a violation of [the FDCPA]." 12 U.S.C. § 5567(a)(1). Defendants argue that Plaintiff did not engage in protected activity because it was not objectively reasonable for Plaintiff to believe that Defendants' overbilling violated the FDCPA when (1) "there is no evidence that any of the erroneous bills were communicated to borrowers"; (2) "even if communicated, the errors were not material"; and (3) "the FDCPA contains a bona fide error exception that applies here." (ECF No. 33-1, at 17).

"To satisfy the first element and establish that he engaged in protected activity, an employee must show that he had both 'a subjective belief and an objectively reasonable belief' that the conduct he complained of constituted a violation of relevant

law." *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008) (quoting *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir. 2008) (discussing the reasonable belief standard under analogous language in the Sarbanes-Oxley Act whistleblower provision, 18 U.S.C. § 1514A)). Here, Defendants do not challenge that Plaintiff held a subjective belief that Defendants were violating the FDCPA when he sent an e-mail to Mr. O'Neil on June 12 regarding the overbilling practice. Instead, Defendants argue that it was not objectively reasonable for Plaintiff to believe that Defendants' overbilling violated the FDCPA.

> [T]he issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts [known to the employee] amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring. If, on the other hand, reasonable minds could disagree about whether the employee's belief was objectively reasonable, the issue cannot be decided as a matter of law. . . . [T]he reasonableness of the employee's belief will depend on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint, analyzed in light of the employee's training and experience.

*Rhinehimer*, 787 F.3d at 811-12 (internal quotation marks and citations omitted).

Plaintiff explains in his declaration that an audit prepared in a mortgage foreclosure case "must include documentation supporting all costs and expense[s]," including

12

the costs for title reports and title updates, in order to "quantify the remaining sum owed by the borrowers to the mortgage holder." (ECF No. 36-7 ¶ 11). The information is important because "[n]o later than 24 hours before a sale, a homeowner can reinstate his/her mortgage by paying the deficient amount[] [owed]," and "[c]osts incurred in relation to the foreclosure proceeding, such as title fees, would be included in the amount required for reinstatement." (*Id.*). Furthermore, even if a borrower did not seek to reinstate the mortgage and the foreclosure process continued, after a foreclosure sale, "[a] [j]udgment may then be entered against the borrowers for any difference between the sale price and the amounts owed per the audit," resulting in a larger judgment due to the overstated title fees. (ECF No. 36, at 6). Plaintiff stated in his email to Mr. O'Neil that Defendants' overbilling practice "[did] not . . . fit into the regulatory environment in Maryland or Federal lender oversight regarding its negative impact on the borrower's total debt," and that from his experience "a no tolerance policy exists when it comes to inaccurate fees and costs that ultimately accrue to a borrower's deficiency judgment." (ECF No. 36-9). Not only could "nothing more than actual costs [] be included at the final audit stage," (ECF No. ¶ 11), but Defendants concede that this was BSI's policy and "had always

been" their policy. (ECF No. 33-2 ¶ 6; 33-3 ¶ 4; 36-2, at 32; 36-10).

Plaintiff argues that Defendants' overbilling practice implicates at least four separate sections of the FDCPA: 1692e(2)(A), 1692e(2)(B), 1692e(5), and 1692f.[2] The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." § 1692e. In this regard, the FDCPA prohibits falsely representing the amount of any debt, falsely representing any services rendered or compensation which may be lawfully received by a debt collector for the collection of a debt, and threatening to take legal action that cannot legally

---

[2] The overbilling practice cannot alone violate both sections 1692e and 1692f. *See Willis v. Green Tree Servicing, LLC*, No. WMN-14-3748, 2015 WL 1137681, at *7 (D.Md. 2015) (stating that a complaint is deemed deficient under the FDCPA if it does not identify any misconduct beyond that which the plaintiff asserts violates other provisions of the FDCPA and thus dismissing the plaintiff's § 1692f claim); *Penn v. Cumberland*, 883 F.Supp.2d 581, 594 (E.D.Va. 2012) (dismissing the plaintiff's § 1692f claim because the plaintiff did not allege any conduct separate from the conduct that formed the basis of his § 1692e claims); *Johnson v. BAC Home Loans Servicing, LP*, 867 F.Supp.2d 766, 782 (E.D.N.C. 2011). Accordingly, the court will consider whether it was objectively reasonable for Plaintiff to believe that Defendants' conduct violated § 1692e.

Plaintiff also states incorrectly that Defendants' overbilling is a violation of state law that is "made actionable by the FDCPA" under § 1692e(5). (ECF No. 36, at 19). A violation of state law "does not constitute a *per se* violation of the [FDCPA]. . . . [T]he purported violation of a state [] law must violate the relevant FDCPA provision." *Ademiluyi v. PennyMac Mortg. Inv. Trust Holdings I, LLC*, 929 F.Supp.2d 502, 524 (D.Md. 2013).

be taken.  §§ 1692e(2)(A); 1692e(2)(B); 1692e(5).  To trigger civil liability against a debt collector, a consumer need only prove one violation of the FDCPA.  § 1692k(a).

Defendants first argue that it was not objectively reasonable for Plaintiff to believe that Defendants were violating the FDCPA because there is no evidence that the erroneous bills were ever presented to any borrowers for payment.  Defendants state that they "submitted the erroneous invoices to BSI for payment, not the debtor," and "[w]hether BSI chose to attempt to collect those amounts from the debtor was not Defendants' decision to make."  (ECF No. 33-1, at 18). Section 1692e does not require that Defendants present the erroneous amounts directly to the borrower.  *See McCray v. Fed. Home Loan Mortg. Corp.*, 839 F.3d 354, 359 (4th Cir. 2016) ("[N]othing in [the] language [of the FDCPA] *requires* that a debt collector's misrepresentation [or other violative actions] be made as part of an *express demand for payment* or even as part of an action designed to induce the debtor to pay." (citation omitted)).  "To be actionable under . . . the FDCPA, a debt collector needs only to have used a prohibited practice '*in connection with* the collection of any debt' or in an '*attempt* to collect any debt.'"  *Id.* (citations omitted); *see also* 15 U.S.C. § 1692e.  Although the billing errors identified by Defendants' investigation ultimately were corrected before BSI collected or

15

attempted to collect the amount owed from the borrowers, the temporal focus is at the time of the complaint. The United States Court of Appeals for the Fourth Circuit has construed the reasonable belief of a violation to allow for a reasonable belief that the violation "may be complete, or it may be in progress." *See Boyer-Liberto v. Fountainbleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (construing the retaliation provision in Title VII, 42 U.S.C. § 2000e-3(a)). Plaintiff has presented evidence that the overstated amount billed to BSI would have ultimately accrued to the borrower either when the borrower sought to reinstate the mortgage by paying the deficiency amount owed or in the form of a deficiency judgment entered against the borrower after a foreclosure sale. Additionally, there is evidence that once BSI received $17,225 from Defendants "as a refund of improperly billed title report costs," BSI "credited each borrower's account with the proper refund." (ECF No. 33-2, at 26). Thus, Plaintiff has put forth sufficient evidence that the overstated costs did accrue to the borrowers' BSI accounts and would have remained on their accounts but for Plaintiff's detection of Defendants' overbilling. Drawing all reasonable inferences in the light most favorable to Plaintiff, a jury could find that it was objectively reasonable for Plaintiff to believe that the erroneous bills would be presented to the borrowers, and thus, that an FDCPA violation was in progress.

Defendants next argue that it was not objectively reasonable for Plaintiff to believe that Defendants' overbilling violated the FDCPA because the billing errors were not material. (ECF No. 33-1, at 19). Plaintiff contends that, at the time he engaged in his alleged protected activity, materiality was only required as to § 1692e(2)(A). (ECF No. 36, at 24). The Fourth Circuit recognizes that "[a]lthough Congress did not expressly require that any violation of § 1692e be material, courts have generally held that violations grounded in 'false representations' must rest on material representations," implicating a materiality requirement as to §§ 1692e(2)(A) and 1692e(2)(B) which both prohibit "false representations."[3] *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 374 (4th Cir. 2012), *abrogated on other grounds by Campbell-Edwald Co. v. Gomez*, 136 S.Ct. 663 (2016); *see Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757-58 (7th Cir. 2009) ("Materiality is an ordinary element of any federal claim based on a false or misleading statement. . . . We do not see any reason why materiality should not be equally required in an action based on § 1692e."); *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1033 (9th Cir. 2010)

---

[3] In *Warren*, the plaintiff's allegations did not involve a false representation, but rather a failure to disclose information. Thus, the Fourth Circuit did not apply the materiality requirement to the plaintiff's claim, stating that "whether a materiality requirement attaches to other violations of § 1692e has no impact on [the plaintiff's] allegations that the defendants violated § 1692e(11)." *See Warren*, 676 F.3d at 374.

("[F]alse but non-material representations are not likely to mislead the least sophisticated consumer and therefore are not actionable under §§ 1692e or 1692f."); *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 596 (6th Cir. 2009) (rejecting the plaintiff's § 1692e claim on materiality grounds). Successively, in *Lembach v. Bierman*, 528 F.App'x 297, 303 (4th Cir. June 12, 2013), the Fourth Circuit, "persuaded by the discussion in *Warren* and th[e] Court's further citation to *Hahn*, *Donohue*, and *Miller*," concluded that "to plead a claim of false representation under the FDCPA, the party must show that the representations are material." Another judge of this court extended the application of the materiality requirement to claims brought under §§ 1692e(5) and 1692f. *Stewart v. Bierman*, 859 F.Supp.2d 754, 762 (D.Md. 2012)("Although the Fourth Circuit has not directly addressed the materiality requirement for FDCPA claims arising under §§ 1692e(5) . . . or 1692f, this Court concludes that a plaintiff bringing such a claim must plead material violations in order to survive a motion to dismiss."). Accordingly, materiality is required in order for it to be objectively reasonable for Plaintiff to believe that Defendants' overbilling practice violated the subsections of § 1692e cited by Plaintiff.

If a representation would not mislead or deceive the least sophisticated consumer with respect to the alleged debt, it is

not actionable under the FDCPA, even if it is technically false. *Penn v. Cumberland*, 883 F.Supp.2d 581, 589 (E.D.Va. 2012); *see e.g.*, *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135-36, 139 (4th Cir. 1996); *Stewart*, 859 F.Supp.2d at 761. For a false representation to be material to sustain a claim under the FDCPA, "it must affect [the least sophisticated] consumer's ability to make intelligent decisions with respect to the alleged debt." *Penn*, 883 F.Supp.2d at 589; *see Donohue*, 592 F.3d at 1033-34; *Hahn*, 557 F.3d at 757-58. The parties have not cited to any authority decided before Plaintiff's alleged protected activity that applies the materiality requirement to an overstatement in the total amount of debt owed by a borrower. In the cases cited by Defendants, *Powell v. Palisades Acquisition XVI, LLC*, 782 F.3d 119, 127 (4th Cir. 2014), and *Conteh v. Shamrock Community Association, Inc.*, 648 F.App'x 377, 379-80 (4th Cir. May 19, 2016), the Fourth Circuit determined materiality by first calculating the difference between the erroneous judgment and the correct judgment to calculate the overstatement. The court then divided the amount of the overstatement by the actual amount owed to determine the overstatement as a percentage of the actual amount owed. Using that approach, the Fourth Circuit found the overstatements of 10.4% and 50% to be material. *See Powell*, 782 F.3d at 127 (an overstatement of more than 50 percent is "material under any

standard"); *Conteh*, 648 F.App'x at 379-80 ("While the degree of the alleged overstatement is not as significant as the overstatement in *Powell*, . . . an overstatement of 10.4% is sufficient to be important to how the least sophisticated consumer responds by causing confusion and a potential challenge by the consumer to the writ."). In *Powell*, the Fourth Circuit stated that "a de minimis misstatement of the total amount owed might not be actionable" but did not determine a threshold amount. *Powell*, 782 F.3d at 127. Here, Plaintiff alleges that Defendants charged BSI, and ultimately each mortgage borrower, $350 for a title report and $175 for a title update when the actual costs were $150 or $250 for a title report and $15 for a title update. Such overbilling would result in an overstatement of $260 or $360 in the total amount of debt owed by a borrower.[4] Defendants' assumption that such an overstatement is immaterial, without presenting any evidence of actual amounts owed, does not demonstrate lack of materiality as a matter of law. Without the proper context, it cannot be said that these amounts are necessarily immaterial. Moreover, Plaintiff's complaint applied to 106 borrower accounts, not just one. Accordingly, a genuine dispute of material facts exists as to whether it was

---

[4] Mr. O'Neil states in his declaration that, after investigation into the total amount of erroneous billing, "the largest overbilling amount was for one file at $350 and the smallest overbilling error was $15. The most common error was $100 to $200." (ECF No. 33-2 ¶¶ 13-15).

objectively reasonable for Plaintiff to believe that the overstatements were material.

Defendants also argue that the overbilling errors were the result of bona fide errors and thus are not actionable under the FDCPA. (ECF No. 33-1, at 22). Section 1692k(c) of the FDCPA provides that "[a] debt collector may not be held liable in any action brought *under this subchapter* if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). The bona fide error defense is an affirmative defense that insulates debt collectors from liability when they have in fact violated the FDCPA. *Webster v. ACB Receivables Mgmt., Inc.*, 15 F.Supp.3d 619, 626 (D.Md. 2014). It is not a defense to an action brought under the whistleblower provision of CFPA. To determine whether Plaintiff engaged in protected activity under the CFPA, the relevant inquiry is whether Plaintiff reasonably believed that Defendants' conduct violated the FDCPA, notwithstanding Defendants' ability to avoid liability for an actual violation. Therefore, a genuine dispute of material fact still exists as to whether Plaintiff engaged in protected activity under the CFPA and Defendants are not entitled to judgment on that basis.

## 2. Unfavorable Personnel Action

Defendants argue that they are entitled to judgment in their favor because "[Plaintiff's] claims of retaliation cannot be based on his voluntary quitting of his employment." (ECF No. 37, at 3).

The CFPA prohibits the termination of an employee who provides information to his employer relating to an actual or reasonably perceived violation of the FDCPA. 12 U.S.C. § 5567(a)(1). Plaintiff has presented evidence that he did not terminate his employment with Defendants voluntarily but, rather, was terminated by Defendants involuntarily. After Plaintiff e-mailed Mr. O'Neil regarding his June 30 meeting with Mr. Shanahan, Mr. O'Neil responded by stating "you will need to sign the attached [resignation letter]" and "[i]f you do not want to resign, then I will accommodate your insistence that you be fired. Let me know which of those two options you prefer." (ECF No. 36-19). Plaintiff did not sign the resignation letter and Defendants considered Plaintiff's employment terminated on June 30. Defendants have not provided any evidence that Plaintiff terminated his employment voluntarily. Mr. O'Neil's statements that Plaintiff could either resign or be fired are evidence to the contrary. Thus, a genuine dispute of material fact exists as to whether Plaintiff suffered an unfavorable

personnel action and Defendants are not entitled to judgment on that basis.

### 3. Causal Connection Between Protected Activity and Unfavorable Personnel Action

Defendants next argue that Plaintiff cannot prove by a preponderance of the evidence that the protected activity was a contributing factor in his alleged personnel action because "there is no evidence in the record other than proximity of time." (ECF No. 33-1, at 25-26). However, if the employer takes the adverse employment action "shortly after" learning about the protected activity, courts may infer a causal connection between the two. *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogation on other grounds recognized by Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017). Where temporal proximity is the only evidence of causation, however, "the temporal proximity must be very close," as it is here. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009) (concluding in a retaliation case under the Sarbanes-Oxley Act that the plaintiffs "raised a genuine dispute of material fact regarding whether their protected activity was a contributing factor to their terminations" based on the proximity of their terminations "within weeks of their alleged protected conduct"); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that causation could be inferred

where the first adverse employment action took place less than three months after an employee's protected activity). Here, Defendants asked Plaintiff to look for another job on June 27 and considered his employment terminated on June 30, just weeks after he notified Mr. O'Neil of Defendants' overbilling practice and expressing his belief that it was unlawful on June 12. Therefore, Plaintiff has put forth sufficient evidence to support his retaliation claim, and the burden shifts to Defendants to demonstrate by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of the plaintiff's protected activity. *See* 12 U.S.C. § 5567(c)(3)(B).

Defendants argue that they "would have taken the same personnel action in the absence of the protected activity" because, in June 2014, (1) "MSO faced dim prospects for future work" when "MCM informed Defendants that it had been outbid" on a large pool of loans, "so there would be no new referrals" (ECF No. 33-1, at 27-28); (2) "a firm client for whom MSO did tax lien foreclosure work told the firm to stop all work on their behalf" (ECF No. 33-1, at 28); and (3) Plaintiff raised objections to Mr. Shanahan's proposal to use the services of a new auctioneer in which "the tone of his long screed emails and suggestions of impropriety raised serious concerns among the

partners of MSO and TOG to the point where Mr. Shanahan recommended asking Plaintiff to resign" (ECF No. 33-1, at 28).

First, Defendants' assertion that they would have taken the same unfavorable personnel action because they lost a large pool of MCM referrals in June 2014 is undermined by the evidence presented by Plaintiff, including: Mr. Shanahan's deposition testimony that it is common for a foreclosure firm to have ebbs and flows in the referral process (ECF No. 36-3, at 25); Plaintiff's declaration that, prior to June 27, he had a "full case load," "was fully occupied with foreclosure work," and "frequently worked long hours (beyond normal business hours)" (ECF No. 36-7, at 9); and an e-mail from BSI Vice President and Branch Manager Justin Wenk asking Mr. O'Neil, "What happen[ed] with Erik and how are we proceeding to handle the pretty large workload he had?" (ECF No. 36-23). Second, although Defendants assert that Mr. Shanahan was devoting significant time to doing tax lien foreclosure work for client Woods Cove and that "[w]ith the cessation of this work, Mr. Shanahan, senior to Plaintiff, would have more time available for the Maryland foreclosure practice work, [] decreas[ing] the firm's need for Plaintiff's services" (ECF No. 33-2 ¶ 20), both parties have presented evidence that it took almost 18 months for Mr. Shanahan to complete his existing work for Woods Cove (ECF Nos. 33-2 ¶ 20; 33-3 ¶ 7; 36-3, at 32). In addition, the parties have

stipulated that "[t]he loss of legal work from Woods Cove was a peripheral point, and not a leading factor by any stretch, with respect to [Mr. O'Neil's] decision to request [Plaintiff] to resign from his job." (ECF No. 36-26). Lastly, Defendants contend that a dispute between Plaintiff and partners Mr. O'Neil and Mr. Shanahan about Mr. Shanahan's proposal to use a new auctioneer damaged the relationship between Plaintiff and the partners. (ECF Nos. 33-2 ¶ 21; 33-3 ¶ 8). Mr. O'Neil testified in deposition, however, that the sole justification for asking Plaintiff to look for another job was economic (ECF No. 36-2, at 39, 40, 49, 50-51), and thus a genuine dispute of material fact exists as to whether the dispute was a basis for asking Plaintiff to resign or be fired. Defendants have failed to present uncontradicted clear and convincing evidence that they would have taken the same unfavorable personnel action in the absence of Plaintiff's protected activity. Therefore, Defendants' motion for summary judgment on Plaintiff's retaliation claim will be denied.

## IV.  Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendants and the motion for leave to file a surreply filed by Plaintiff are denied. A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge
